## Brookhaven Lumber & Mfg. Co. *v.* Illinois Central R. R. Co.

1. **Railroads.** *Negligence. Sudden danger. Efforts to stop train.*

    By the wrongful act of some one unknown, a switch leading upon a side track was left open, and, beyond this on the side track another switch was misplaced. At night the engineer of a passenger train, running on the down-grade 35 miles an hour, at a distance of 300 feet, saw that the first switch was open and promptly applied the air brakes, but the train rushed upon the side track, was derailed at the second switch and ran into a mill shed, which would not have been struck but for that switch, which the engineer did not see. In an action against the company by the owner of the property destroyed by fire communicated in the collision, *held*, that it was proper to refuse an instruction that the jury should find for plaintiff if the engineer discovered the first open switch at a sufficient distance to have stopped the train before the collision, and failed to resort to such appliances as if resorted to would have prevented the collison.

2. **Same.** *Emergency. Duty of engineer. Cause of accident. Error of charge.*

    The error of the above instruction is in requiring of the engineer, in a moment of sudden peril, the prudence and self-possession in action to be expected of one under totally different circumstances; and, further, in assuming that he could anticipate the misplacement of the second switch and consequent derailment, this being the efficient cause of the injury.

3. **Same.** *Sudden peril. Exercise of judgment. Efforts to prevent collision.*

    If the engine, train and appliances were in good condition, and the engineer, in the discharge of his duty, was suddenly confronted with difficulty and danger impossible to anticipate, he was only required to act with reference to what he then saw and knew. The company is not liable for his failure, in such emergency, to exercise cool and unembarrassed judgment. If he did the best he could situated as he was, nothing more could be required.

4. **Verdict.** *Irregular conduct of juror. Duty of court.*

    While the administration of justice must be kept above suspicion, mere irregularities of behavior in this day of greater freedom of jurors, at least in civil cases, will not vitiate a verdict. Bribery and embracery, and misconduct of jurors purposely brought about by a successful litigant, will require the arbitrary setting aside of a verdict; but, where only irregularities have occurred that do not necessarily or naturally involve suspicion of improper influence, the trial court should hear testimony and examine the matter with a view to ascertaining whether

any improper influences have been exerted, and whether upon the whole case a new trial should be granted.

5. SAME.  *Finding of trial judge.*

In such case where the trial court has investigated a charge of misconduct on the part of a juror, and where, upon the evidence, it cannot be said that the verdict rests under any suspicion of having been obtained by improper influence, the action of the court in refusing to set aside the verdict will not be disturbed.

6. DAMAGES.  *Property destroyed by fire.*  *Insurance.*  *Motive.*

In an action of damages for property destroyed by fire, where the defendant (as tending to show a motive on the part of plaintiff to cause the fire), proves that plaintiff received payment of an insurance policy on the property, and the court instructs the jury that this cannot be considered in reduction of damages caused by defendant's negligence, the plaintiff cannot complain.

FROM the circuit court of Lincoln county.

HON. J. B. CHRISMAN, Judge.

The facts of this case as found by the court from a voluminous record are stated in the opinion. Among other things, the court instructed the jury for plaintiff, in accordance with § 1059, code 1880, that proof of injury caused by the running train of defendant was *prima facie* evidence of negligence, and imposed upon defendant the burden to disprove the presumption of negligence.

The 2d, 3d, and 4th instructions, given for the defendant, and referred to in the opinion of the court, are as follows:—

" 2. If the jury believe from the evidence that the engine, train and machinery of the defendant, which constituted the wrecked train, were in good condition and perfect working order on the occasion of the accident, and that the engineer, Berry, was faithfully discharging his duties when he discovered the condition of the switch, and that after discovering that the switch was open, he did everything which a skilful, prudent and cautious engineer could or would have done under the circumstances and conditions which then surrounded him to prevent the accident, then the plaintiff cannot recover because of a failure to stop the train before it came in contact with the mill."

" 3. The proper inquiry is not whether the accident might have

68 MISS.—28

been avoided if the railroad company had anticipated the occurrence, but whether, under the circumstances as they then existed, the company was negligent in failing to anticipate and provide against the occurrence.   The law does not require of the defendant the use of every possible precaution to avoid injury to individuals or property, nor that the railroad should have employed any particular means which, it may appear after the accident, would have avoided the damage.   The defendant was only required to use such reasonable precautions to prevent accidents as would have been adopted by prudent persons prior to the accident. Therefore, if the jury believe from the evidence that the defendant took such care and so conducted itself with reference to plaintiff's property as a person of ordinary prudence and caution would under like circumstances use, if his own interest were to be affected, then defendant is not liable."

" 4. Even though the jury may believe from the evidence that the split-switch was carelessly and negligently left open by defendant's servant, yet if they further believe from the evidence that the use of the stub-switch to which it was ordinarily placed by plaintiff's and defendant's servants was such as would leave it so placed that a train leaving the main line at the split-switch would take either the front switch or the horn-switch and that in either event the train could ordinarily be checked without injury to plaintiff's property, and that the injury complained of in this instance would not have occurred but for the condition of the stub-switch at the time of the accident and that such condition was not attributable to the defendant's negligence, then plaintiff cannot recover."

The court also gave the following instruction for the defendant :—

" 6. Even if the jury believe from the evidence that the switch was left unlocked by the train which went north and which did the switching at St. Charles, and even though they believe that it was so left unlocked through negligence, yet the plaintiff cannot recover because of such negligence if the jury further believe that the defendant company thereafter and before the accident, caused and procured the said switch to be locked and properly

placed.   Nor can the plaintiff recover in this cause even if the jury believe that the railroad company was negligent in respect to the switch at Cedar Hill, because of such negligence.   Nor can the plaintiff recover in this case even should the jury believe that after the accident an inferior lock was placed on the St. Charles switch because of that fact.   The plaintiff must recover, if at all, by showing negligence on the part of the railroad company, and the whole evidence must satisfy the jury that the railroad company was so negligent, and it must be shown to their satisfaction also that the particular negligence contributed to, brought about and caused the damage for which suit is brought.   Unless, therefore, it is shown from the evidence to the satisfaction of the jury that the railroad company was negligent and that the negligence so shown caused the accident, plaintiff cannot recover."

*H. Cassedy* and *Miller, Smith & Hirsh*, for appellant.

1. It was manifestly erroneous to admit the testimony as to the amount of insurance plaintiff had upon the property at the time it was destroyed.   This did not show that the affair was caused by any act of the plaintiffs.   Nor was the evidence admissible in reduction of damages.   1 Sutherland on Dam. p. 243.   The evidence was impertinent and irrelevant and only tended to prejudice the cause of plaintiff in the eyes of the jury.   Even if the court should believe that the testimony relating to the acts and threats of Allen tended to show that the switch was misplaced by him, still the evidence was immaterial, for it was shown that he himself had a motive in misplacing the switch, having been discharged by the railroad company.   The plaintiff was in no manner connected with Allen.

2. It was error to refuse plaintiff's instruction found on page 31 in the record, and in giving the converse for defendant.   This refused instruction was, that if the jury should believe that the switch was open through no negligence of the defendant, yet if the engineer discovered that it was open while at a sufficient distance therefrom to have stopped the train by a resort to such appliances as would have prevented the collision, then the defendant was guilty of negligence and the verdict should be for plaintiff.   It should have been left to the jury to say whether he had time to do more

than he testified was done.   *Bedford* v. *Ry. Co.*, 65 Miss. 385; *Kent* v. *Ry. Co.*, 67 Ib. 608.

The refusal of plaintiff's instruction was virtually to take a part of the case from the jury.   The court thereby adjudged that the engineer could not have done more in order to stop the train than was done, whereas, the jury might have believed that he could have done something else to check the train besides applying the air-brakes.

3. The court erred in refusing plaintiff's instruction to the effect that the evidence offered to show that Allen misplaced the switch was not sufficient to justify a jury in concluding that the accident had occurred in this way, and that the evidence of plaintiff's having insurance was insufficient to show that plaintiff caused the wreck, and therefore that the jury should disregard these matters as tending to relieve defendant from liability.   An inspection of the record demonstrates that the evidence on these two points was thrown in as a mere make-way.   Vague threats made by Allen several days before the accident, when taken in connection with the other facts in the case, were of too small importance to warrant a verdict.   There being no difference and no dispute as to this, the instruction should have been given.   It was not a question as to the *weight* of the evidence or whether it was true.

4. The court should have granted a new trial on account of the misconduct of the juror Dixon.   Where a juror has been treated, fed, or entertained by the successful party, or his counsel, or at the expense of either, a new trial in nearly all cases will be granted. This rule is deemed indispensably necessary to preserve the integrity of jurors.   Being founded upon public policy, it will be enforced without reference to the accident whether or not the verdict was right.   On this point, see Thompson on Trials, § 2564; *Lyons* v. *Lawrence*, 12 Bradwell (Ill.), 531.

Litigants are entitled to a trial by a fair and impartial jury. There can be no difference between intimidation practised on jurors and persuasion, bribery or other means.   *Lamar* v. *State*, 64 Miss. 687.   And there can be no difference in principle between civil and criminal cases.

There is nothing in the idea of estoppel in this case. The parties litigant have a right to rely until the last moment upon the jurors' returning sense of justice and legal accountability. Nor is there any difference between favors conferred by the parties themselves and those received at the hands of representative adherents or friends.

*W. P. & J. B. Harris,* for appellee.

After submitting a lengthy argument on the facts, counsel made the following points :—

1. There was no error in refusing plaintiff's instruction. It assumed that the engineer, who suddenly saw the switch open which led to the side-track, was thereby admonished of the whole complication and all the danger of the situation. It assumed that he must use appliances to prevent a collision with the lumber shed when there was nothing to indicate that there would be such collision. If the train had remained upon the rails the shed would not have been struck. The instruction is an attempt to subordinate the proximate and efficient cause of the disaster to the question of the conduct of the engineer under supreme difficulties and entrapped as he was in a perilous situation. The court could not apply a standard which at the instant invested the engineer with the prescience of seeing what we *now* see. Juries are prone to apply this false standard. It is easy to be wise after the event. Suddenly coming into an unexpected danger, the engineer was not required to do all things that could have been done. On this point, see *Railroad Co.* v. *Trotter,* 61 Miss. 417; Shear. & Redf. on Neg. p. 5; 11 Exch. 728.

We submit that there was no evidence to justify the instruction, and that the proper rule was announced in the 2d, 3d, 4th and 6th instructions given for the defendant.

The plaintiff was given the benefit of the statutory presumption of negligence in an instruction which the court granted, and defendant's sixth instruction in connection with this was proper. *Railroad Co.* v. *Phillips,* 64 Miss. 693.

The proof made it clear that the defendant was not responsible for the condition of the switches. It was then incumbent upon the

plaintiff to show some particular fault on the part of the defendant to justify a recovery. *Railroad Co.* v. *Packwood*, 59 Miss. 280; *Railroad Co.* v. *Bourgeois*, 66 Ib. 3.

2. The court below carefully investigated the charge of misconduct imputed to the juror Dixon. To. this finding we must give the weight attached to the verdict of a jury; but, if we review the facts anew, we find the decision supported by the evidence. The proper rule in cases of this character is to be gathered from cases in our courts. See 5 How. 192; 9 S. & M. 121; 13 Ib. 400.

We add to these, cases of embracery or actual attempt to bribe or seduce the jury, 40 Vt. 663; 55 Maine, 563; 38 Conn. 188. We also refer the court to Thompson on Trials, §§ 2560, 2567; 22 Ohio, 333; 24 N. J. Law, 538; 11 R. I. 188; 17 Maine, 30; 32 Ga. 325; 15 Nev. 158; 32 Iowa, 34; 76 Vt. 128; 120 Ill. 166; 87 Ind. 45; 10 Mees. & W. 137.

Jurors are not expected to abstain from following their usual habits as to drinking and eating in moderation. 8 Gratt. (Va.) 637; 31 N. J. Law, 52; 22 Ib. 176; Baylies on New Trials & Appeals, 542; 61 Ga. 419.

Plaintiff knew of the drink being furnished to the juror before the verdict, and yet took the chances of a favorable decision. This is held an estoppel. 60 Iowa, 57; 95 Ill. 394; 139 Mass. 41.

3. The evidence as to the insurance, if improper, was completely eliminated from the case by the instructions, and by the rejection of the plea as to this offered by defendant.

4. Neither the improper admission, nor the erroneous exclusion of evidence will justify a new trial where the right result has been reached; nor where it appears from the whole case that the same result ought to follow on another trial. 1 S. & M. 381; 7 Ib. 715; 12 Ib. 164.

Argued orally by *T. M. Miller*, for appellant, and *W. P. Harris*, for appellee.

WOODS, C. J., delivered the opinion of the court.

This action was brought by the appellant in the court below for the recovery of $30,000 damages for injuries alleged to have been

sustained by the appellant in the destruction by fire of its mills near Brookhaven by reason of the negligent conduct of the appellee, or its servants.

It is shown with reasonable certainty that the large property of appellant's was destroyed by fire communicated by a wrecked engine of the appellee, and it is shown that the destruction and loss occurred in this manner : Appellant was the owner of certain lumber mills, situated on the Illinois Central Railroad about one mile north of the town of Brookhaven, said mills and lumber sheds and yards being situated adjacent to the right of way of said railroad company, and to a small extent actually upon such right of way. A side-track, for the convenience and accommodation of the business of these mills, was laid from the main line of the railroad out to and through one side of the mill property, being connected, at its north end, with the main line by a switch of that character, known as a split-switch, which was provided with the usual and proper appliances for moving and using and handling this switch in putting in upon and taking out cars from this side-track, and this side-track did not again return to the main line, and had its southern terminus in the lumber yards of appellant. About 100 feet from the intersection of the side-track with the main line at the split-switch, an interior yard track sprang out from the first side-track, already mentioned, and ran around for a considerable distance on the eastern side of the mill property, and, like the main side-track, did not return again to the main line, or to the original side-track, but terminated in the mill yards on the eastern border of that property, and this additional and interior side-track was connected, at its point of departure, with the main side-track by a switch of that character, known as a stub-switch. The split-switch connecting the first side-track with the main line of appellee's railway was under the control and in the charge of the servants of the railroad, and was kept securely locked, when not in actual use in the shifting of cars from the main line to the side-track, and *vice versa*. The stub-switch was in the joint control of the servants of appellant and appellee, and was handled at will, in the shifting of cars, as occasion demanded, by the servants

of both parties, and was never locked, being left movable for the convenience of appellant's servants in handling cars in their employer's lumber yards. The stub-switch could be set so as to throw cars on either the main side-track, or upon the interior one, and, unless set for the one or the other of these side-tracks, any train or cars coming in upon the side-track from the main line would be necessarily and assuredly derailed at the stub-switch. The split-switch, connecting the original side-track with the main line, could be set for the main line or the original side-track, at the pleasure of the switchman, and it could only be so set, for no derailment of moving cars would naturally occur at the split-switch, no matter how it might be set; and the main line of railway of appellee at and for some distance north of this mill has a sharp down grade southward.

It appears clearly, also, that, on the evening of the accident which resulted in the destruction by fire of the mills, the southbound mail train of appellee was nearly an hour behind its schedule time, and was running at the rate of thirty-five miles an hour, when it reached the mills in question after 7 o'clock P. M., in the night time at that season of the year; that when about the distance of three hundred feet from the split-switch, the engineer of the swiftly rushing train discovered, to his surprise and alarm, that this switch had been and then was set for the side-track, leading into the mill-yard, instead of for the main line, as it should have been, and as it had always theretofore been at the hour for the passing of his train, as must be assumed from all the evidence in the case; that the surprised and imperilled engineer, confronted with the dangers of an unexpected and unforeseen condition, not resolvable with confidence or with absolute safety, but demanding instant resolution and action, as quickly as possible, applied his air-brakes, and before he could do more found himself hurled into the jaws of the yawning switch, and almost as quick as thought, afterwards, felt his engine pounding over the cross-ties, and then ploughing through the bare earth, and speedily thereafter was hurled from his place amongst the scattered lumber in which his engine had buried itself, and from which his fireman was taken, a few moments later,

a bleeding and lifeless body ; and that the fire and loss immediately followed, and were produced by this frightful accident.

In exoneration of itself from the charge of negligence, the appellee showed these facts :—

*a.* That the conductor and brakeman of the north-bound midday local train of that day, after doing some switching at the mill [taking out and putting in cars], closed the split-switch against the first side-track and set the same for the main line, and did all necessary to be done to keep the switch so set, except to lock it, and, after so setting the switch, backed the train down south over it and picked up the caboose or rear car of the train and then safely carried the train north over the switch so set for the main line, having also left the stub-switch set for the mill-yard.

*b.* That this train met the south-bound freight at Wesson, a point about ten miles north of the mills, and, remembering the failure to lock the switch, the upward conductor notified the down-train men of the condition of the unlocked switch, and requested them to check up at the mills and rectify the error the careless brakeman had committed in failing to lock, and that the south-bound conductor, being advised and on the look out, when his train reached the mills, found the switch properly and securely set for the main line, and ran his train by the switch and mills down to Brookhaven, a mile below, when he obtained the promise of the conductor of a wrecking train, then lying at that station, to go up with his engine and lock the switch.

*c.* That the conductor of the wrecking train, accompanied by the fireman of that train and a young man who lived in Brookhaven, immediately went up on his train's engine, ran it over and north of the split-switch, then stopped, got off, went back and, finding the switch target upright and set for the main line, picked up the switch-lock from the block, inserted it in its appropriate place and locked the same, and then backed the engine down over the locked switch to the Brookhaven depot; and this wrecking train conductor observed, as did his fireman likewise, when he locked the split-switch, that the inner or stub-switch was not displaced but was set for the additional or supplemental side-track running

into the eastern side of the mill-yards, and it is shown that this wrecking conductor's visit to and examination of the switches was about 4.30 P.M. of the day the fire occurred.

*d.* That no other train passed over the road at the mill or came near the mill-switch until the down mail train reached that point, shortly after dark, and met death and destruction there awaiting it; and it is nowhere intimated that any employé of appellee was ever near the mill after the wrecking conductor locked the split-switch and before the luckless mail train arrived.

*e.* That Pfeiffer, a superior servant of appellant, and its witness, testifies that he saw the wrecking engineer come up on the engine, between 4 and 5 P.M., and work at or handle the switch-lock, and that the target on the lever was upright, and showed the switch set for the main line, and that he did not see it moved by the wrecking conductor.

*f.* That almost immediately after the train had been wrecked, an examination showed the split-switch set for the side-track, and the same, in all its parts, entire and unbroken, while the interior or stub-switch was seen to have been misplaced and set for neither side-track, and that the engine left the rails at this stub-switch.

In opposition to these facts disclosed in evidence by the appellee, the appellant introduced Pfeiffer [the person just hereinbefore named] and two other servants of appellant, employés at the mills, who testified that the wrecking engine which came up to the split-switch, from Brookhaven, did not run north of this switch, but stopped south of it; and, furthermore, the evidence of one Caroline Jones was put in, to discredit the exonerating evidence of appellee, which we have set out herein with some fulness, and this evidence of Caroline Jones was to the effect that she saw this switch-target, after the wrecking engine had gone back to Brookhaven, and that it was standing at an angle of about 45 degrees, showing it was set for the mill side-track.

To impair the weight of Caroline Jones's evidence, appellee showed that, though she was examined, soon after the destruction of the mills, at an inquest held over the body of the fireman of the wrecked train, who was killed in that accident, she had wholly

failed to refer to this fact of the target being seen by her inclined, and showing the switch was set for the mill side-track.

With this comprehensive and careful summary of the important points of the controlling evidence borne in mind, the questions necessary to be considered, in the determination of the cause, will be made so clear that their real character, and their relations to the issue joined, and to each other, will readily appear.

On the trial below, the jury found for the defendant, and, the court declining to disturb the verdict on motion of plaintiff for a new trial, the cause has been brought before us by appeal.

1. The action of the court in refusing the instruction, on page 31 of the record, asked by plaintiff on trial below, and in giving the 2, 3, and 4 instructions prayed by defendant is assigned for error. The refused instruction of the appellant is in these words: " The court instructs the jury that although they may believe from the evidence that the switch was open through no negligence of the railroad company, yet if they believe further from the evidence that the engineer discovered that the switch was open while at a sufficient distance therefrom to have stopped the train before its collision with the lumber shed, and that, though discovering the danger, he failed to resort to such appliances as if resorted to would have prevented such collision and consequent fire [if the jury believe from the evidence the fire was a consequence], then the failure to stop the train was such negligence as to render the defendant railroad liable for any injury to plaintiff's property that so resulted."

The instructions given for appellee on this branch of the case, required the jury to put itself in the engineer's place, in his position, when he suddenly and unexpectedly found himself called to face unforeseen difficulty, and to act on a fearful complication not anticipated, and to judge of his conduct by the baleful light of the perplexing surroundings into which he found himself inextricably thrust in the twinkling of an eye.

These instructions for the appellee propounded the just rule, the fair rule, the true rule, and there was no error in the court's action in giving them. The refused instruction of appellant not only

contained no recognition of this rule, but it laid down for the guidance of the jury in examining into and passing upon the conduct of the engineer, a proposition which fixed liability upon the appellee because of the want of foreknowledge in that servant. The instruction, by necessary implication, condemns the engineer, because he did not foresee that the stub-switch [which he did not see with fleshly eyes] was open, and, because of this lack of prescience, he did not guard against the derailment of his locomotive at the stub-switch and its subsequent plunge into the lumber shed; for, unless he could foresee that the stub-switch was open, he cannot be held to have anticipated the derailment of his engine at that point, and the subsequent collision with the lumber shed. The engineer's failure to act with the coolness, the self-possession, and the unerring wisdom which should characterize his conduct in handling and controlling his engine under the ordinary and anticipated and favorably concurring conditions of his accustomed daily task, is, by necessary implication, deducible from the refused instruction; but, far more, and far worse, such failure is put for the proximate cause of the injuries complained of, while the unseen open stub-switch, the efficient cause, is overlooked and disregarded. The open split-switch was a *causa sine qua non* to the catastrophe, but the *causa causans* was the open stub-switch by which the engine was thrown from the rails and turned loose, unmanageable, upon its destructive work. Of course, if the engineer had reasonable time, and fit opportunity to prevent the impending calamity, and failed to do so, the appellee is liable; but in the case at bar, with its facts finally resolved, if liability is to be raised, about six seconds must be held reasonable time in which to make ready to use the various appliances for stopping a train, and in which to actually put into effective operation such appliances [for the train would be in the very jaws of the open switch in about six seconds from the time of its discovery by the surprised engineer], and, moreover, the unhappy engineer must be held to have naturally anticipated that the stub-switch would be open, and that his train would be derailed at that point, and that it would, consequently, collide with a lumber shed about 200 feet distant, and not any-

.where touched by either side' track—a prescience involving the preternatural.

But we forbear to press remark further on this point, and content ourselves by saying that the engineer was only required to act in view of what he then saw, situated as he was, and that suddenly and unexpectedly confronted with a complicated difficulty impossible to have been foreseen, he is not to be held accountable for failure to exercise that cool and unembarrassed and unerring judgment which we, freed from sudden surprise and danger, could now form and execute. He appears to have done the best he could, situated as he was, and nothing more could reasonably be required of him.

2. The ruling of the court upon the motion to set aside the verdict because of the alleged misconduct of the juror, Dixon, is also assigned for error.

While it cannot be too strongly insisted that the stream of justice shall be kept pure—so pure as to afford no suspicion of corrupt or improper intermingling of any foreign or hurtful matter, yet it must not be forgotten that no mere irregularities of behavior, in this day of greater and wiser freedom for jurors, at least in civil trials, will be permitted to disturb the stability of judicial proceedings. While it is yet the settled law that bribery and embracery and misconduct in the jury purposely brought about by a successful litigant will require the arbitrary setting aside of the verdict thus obtained, both as promotive of the course of public justice and as a punishment upon the offender, yet it must be taken as equally well-settled that in other cases, where only irregularities have occurred that do not necessarily or naturally involve suspicion of improper influence in the finding of the verdict, the approved course is, upon proper presentation of a complaint, for the trial court to examine witnesses and take testimony, with the view to ascertaining whether any improper influences have been put in operation to control the mind of any or all of the jurors, and, after ascertainment of the facts, with the further view of sustaining or setting aside the verdict, as the facts disclosed upon such examination may demand.

This was the course pursued by the able judge who presided in the court below, and we have no hesitation in concurring in his judgment that the evidence submitted upon the motion failed to make out a case requiring a setting aside of the verdict as a punishment to be imposed upon the successful party.   It is the case of an old man who was infirm and who had been habituated to drink, weakly and unwisely seeking a glass from his neighbor and friend, and whose want, in the absence of means to meet it by his friend, was supplied, to the extent of a single draught, by an employé of the appellee, at the request of the juror's friend.   That the act of supplying the drink to the juror was not done with any purpose to affect the juror's mind touching the case being then tried, and that it did not so affect it, was so formed by the trial judge in denying the motion, and in this action of the court we see no error.

It is to be regretted that the weakness of the juror in this case subjected a verdict, reached only after laborious and protracted effort, to any imputation of fraud, but, without disregarding the evidence of all the witnesses, including the offending juror himself, we cannot say that the verdict rests under any suspicion of having been obtained by any improper influence.

3. Complaint is made because of the admission of evidence showing the amount of insurance held by appellant upon the burned property, and because of the refusal by the court to instruct the jury to disregard that evidence, and the evidence tending to show motive and purpose on the part of one Allen to injure appellee's property.

It seems to be conceded that the evidence was competent as tending to show motive.   The evidence showing insurance clearly was not admitted to reduce the amount of any damages that might be awarded.   The court refused to permit appellant's fifth plea, in which the insurance was sought to be availed of as a matter in mitigation or reduction of damages, to be filed at all ; and, that the jury might certainly not consider that defense the court charged the jury, at appellant's request, that the appellee could not escape liability for any part of the damage caused by its negligence, because of such insurance on the property.

That the court below erred in declining to instruct the jury that one piece of evidence, dissociated from all the other evidence in the case, neither proved nor tended to prove motive, we are not prepared to say. To our minds, the evidence as to Allen and as to appellant, offered as tending to show motive, is inconclusive, wholly unsatisfactory and utterly empty. The evidence in the case, taken all together, leaves no room to doubt that the fire and consequent loss were the result of the derailment of appellee's engine and its collision with the lumber shed. Freely and fully conceding this, the verdict is so manifestly in agreement with the great facts in proof, so consonant with reason and right, that we do not feel authorized to disturb it on any ground.

*Affirmed.*