UNDERWOOD et al. v. ILLINOIS CENT. R. CO.

No. 14304.

United States Court of Appeals Fifth Circuit.

June 18, 1953.

Holmes, Circuit Judge, dissented.

Landman Teller, Vicksburg, Miss., Francis S. Bowling, Jackson, Miss., Fred C. Berger and Chas. F. Engle, Natchez, Miss., for appellants.

6. Reynolds v. United States, 98 U.S. 145. 25 L.Ed. 244.

Burkett H. Martin and R. L. Dent, Vicksburg, Miss., Burch, Porter & Johnson, Memphis, Tenn., Dent, Ward & Martin, Vicksburg, Miss., for appellee.

Before HOLMES, STRUM and RIVES, Circuit Judges.

RIVES, Circuit Judge.

The railroad crossing accident in which the appellants were injured occurred at about 8:30 o'clock on the night of April 11, 1950, at what is known as the Selma crossing on U. S. Highway 61, about eight miles north of the city of Natchez, Mississippi. Just prior to the collision, the automobile driven by Murray, and in which Underwood was a passenger, was traveling in a southerly direction and the train had been traveling in a northerly direction. The extent of the traffic on the part of the railroad between Natchez and Harriston, a town about twenty-eight miles further north, was one freight train each twenty-four hours from Natchez to Harriston and return, with no passenger trains running on that part of the railroad. Both the highway and the railroad ran in a northerly and southerly direction. North of the crossing, the highway was on the west side of and almost parallel to the railroad until it got close to the crossing, when it made a left curve, went across the railroad, then a right curve and continued to go south. The highway was practically straight for a distance of 225 feet just north of the crossing, though the investigating officer testified that in his opinion a car coming around the curve would be only about 150 feet away from a train occupying the crossing when the automobile lights first shone on the train. At a point on the west side of the highway fifty-six feet north of the crossing was a sign reading "Stop, Mississippi Law", and at a point seven hundred and twenty feet north of the crossing was another sign reading "Railroad Crossing". At the point of the crossing there was a thirty-four degree angle between the railroad and the highway.

There is a side track on the east side of the main line of the railroad just south of the crossing, at such distance that the part of the main line between the highway and the switch will hold a locomotive and a railroad car. As the train proceeded northerly, the engineer brought it to a stop before reaching the crossing, uncoupled the engine, backed into the siding, and picked up a box car loaded with pulpwood. He then pulled out on the main line, backed in to recouple with his train, and had proceeded on northerly to a point where the collision occurred. The automobile ran into the eighth car of the sixteen car freight train.

There was no dispute as to the facts thus far stated. Under the evidence, the jury would have been authorized to find the following additional facts. The automobile, a new 1950 model Buick was in perfect condition, including its brakes, steering gear and lights. Murray was a good and careful driver. Murray had been on this particular section of the highway on one other occasion and Underwood had never before traveled this part of the highway. The automobile had been traveling at a speed of approximately fifty-five to sixty miles per hour with bright or driving lights on. Murray and Underwood each testified that he was awake and watching but denied seeing either of the warning signs. They both saw the train for the first time when the lights of their automobile shone on the railroad car, but Murray's efforts then to avert the collision were unavailing.

To overcome the evidence of their negligence in failing to observe either of the warning signs and in driving into the side of the train, the appellants invoked the humanitarian "last clear chance" doctrine, and relied particularly upon the following testimony of the locomotive engineer:

"Q. What was the first—Did you ever see the Murray car yourself, Mr. Mobley? A. Yes, sir. I saw the headlights. That was all.

"Q. How far was it from the crossing when you saw the headlights? A. Well, I would say it was 300 feet, 400 maybe right in that neighborhood.

"Q. Somewhere around three or four hundred feet? A. Yes, sir.

"Q. What rate of speed was the car going at that time? A. It looked like he was going at a fast rate of

speed, just judging from the lights coming down the road.

"Q. You think he was going pretty fast? A. Yes, sir.

"Q. Well, did either the fireman or brakeman say anything to you about the car? A. No, sir. I called their attention.

"Q. What did you say? A. I asked them whether that car was going to get to a stop.

"Q. What did they say? A. The brakeman turned around to judge it, to see whether it was going to get to stop or not.

"Q. And did he say anything to you about whether or not it was going to get to stop? A. He said, 'No'.

"Q. And the fireman had stopped firing then? He fired back up there when you were pumping— A. He was firing when I asked whether the car was going to get stopped or not.

"Q. Did you see the car, using the brakeman's window? Is that the window you saw it out of? A. The left cab window, yes, sir.

"Q. In other words, it was almost to your left when you first saw it? A. Yes, sir.

"Q. What did you do then, Mr. Mobley? A. Applied the brakes for emergency when he said 'No'."

The engineer testified that he had gained a speed of about fifteen miles per hour and that after he applied the emergency brakes it took approximately seventy-five feet within which to bring the train to a stop. At another place in his testimony, he said that the train went three and one-half or four car lengths (or as much as 175 to 200 feet) before it stopped. If we assume that at the time the emergency brakes were applied the train was traveling fifteen miles per hour, and that the approaching automobile was traveling sixty miles per hour, and that the train was actually stopped at the time of the collision, as the evidence tended to show, then, the automobile would have been somewhere between 300 feet and 800 feet north of the crossing when the engineer applied the brakes. The engineer

testified that he had given the regular whistle and bell signals before reaching the crossing, but did not blow the whistle after he passed the crossing, and would not say whether the bell was still automatically ringing or not. The engineer was familiar with the crossing, and knew of the curve around which the automobile must travel before its lights would shine on the train. The thirty-four degree angle between the railroad and the highway, together with their nearly parallel location, beyond the curve were such that the engineer north of the crossing may have had a clear view of highway traffic moving south, while the train and the lights on the engine may not have been obvious to the operator of the motor vehicle.

At the conclusion of the plaintiff's evidence, the District Judge directed a verdict for the defendant relying particularly upon three cases decided by the Supreme Court of Mississippi, Gulf, M. & N. R. Co. v. Holifield, 152 Miss. 674, 120 So. 750; Spilman v. Gulf & S. I. R. Co., 173 Miss. 725, 163 So. 445; and Boyd v. Illinois Cent. R. Co., 211 Miss. 409, 52 So.2d 21. In effect these cases held that the occupancy of a crossing by a railroad train was a sufficient warning within itself. They recognized, however, the following qualification, as expressed in the latest of the three cases, Boyd v. Illinois Cent. R. Co., supra, 52 So.2d at page 23:

"unless the conditions and circumstances are such that the employees know, or in the exercise of reasonable care and caution should know that a person driving upon the highway at a reasonable rate of speed in an automobile properly equipped with lights, and carefully operated, could not see or might not be able to see the cars in time to avoid a collision therewith."

Neither of these cases involved the application of the last clear chance doctrine, which is firmly imbedded in the jurisprudence of Mississippi. Vicksburg & Jackson Railroad Co. v. Patton, 31 Miss. 156; Mississippi Cent. R. Co. v. Mason, 51 Miss. 234; Fuller v. Illinois Cent. R. Co., 100 Miss. 705, 56 So. 783; Gulf, M. & N. R. Co. v. Arrington, Miss., 107 So. 378; Mississippi Cent. R. Co. v. Aultman, 173 Miss. 622,

160 So. 737, 740. In the last cited case the Mississippi Supreme Court said: "When the engineer saw and appreciated the peril, it was his duty to use every reasonable means to prevent the collision." Other Mississippi cases have recognized that it was for the jury to say whether the failure to give warning by a blast of the train whistle was the proximate cause of an accident. Johnson v. Columbus & G. Ry. Co., 192 Miss. 627, 7 So.2d 517; Young v. Columbus & G. Ry. Co., 165 Miss. 287, 147 So. 342.

Under the evidence in this case, it was open to the jury to find that the engineer saw and appreciated the peril of the appellants and the fact that they were unaware of the train in time to give warning by a blast or blasts of the whistle. Admittedly he failed so to do. It was for the jury to say whether such failure was negligence and whether it operated proximately to cause or contribute to the collision. See Zickefoose v. Thompson, 347 Mo. 579, 148 S.W.2d 784; cf. Chesapeake & O. Ry. Co. v. Switzer, 275 Ky. 834, 122 S.W.2d 967.

It follows that the court erred in directing a verdict for the defendant and the judgment is

Reversed.

HOLMES, Circuit Judge.

I dissent.