**ILLINOIS CENTRAL RAILROAD COMPANY, Appellant,**

v.

**Nathan R. UNDERWOOD and Richard M. Murray, Jr., Appellees.**

**No. 15913.**

United States Court of Appeals
Fifth Circuit.

Aug. 3, 1956.

Rehearing Denied Oct. 4, 1956.

---

R. L. Dent, M. E. Ward, Vicksburg, Miss. (Burch, Porter & Johnson, Memphis, Tenn., Joseph H. Wright, Vice-President and Gen. Counsel, Illinois Cen-

tral R. R. Co., Chicago, Ill., John W. Freels, Gen. Solicitor, Illinois Central R. R. Co., Chicago, Ill., of counsel), for appellant.

Landman Teller, Vicksburg, Miss., Fred C. Berger, Natchez, Miss., E. H. Cunningham, Jr., Jackson, Miss., for appellees.

Before HUTCHESON, Chief Judge, and CAMERON and BROWN, Circuit Judges.

CAMERON, Circuit Judge.

This appeal calls on us to decide whether evidence offered in the present trial was sufficiently different from that before us when we reversed the case on the prior trial, to bring about a different result. An automobile driven by appellee Murray, in which appellee Underwood was a passenger ran into the side of a freight train, and both appellees sustained serious injuries. The two actions brought against the Illinois Central Railroad Company, appellant, were consolidated and resulted in a directed verdict in favor of the Railroad on the first trial. We reversed,[1] holding that, "Under the evidence in this case," the jury might find in favor of the two injured men on the doctrine of Last Clear Chance.

In stating the facts before the Court in the former appeal we used in part the following language:

"The railroad crossing accident in which the appellants were injured occured at about 8:30 o'clock on the night of April 11, 1950, at what is known as the Selma crossing on U.S. Highway 61, about eight miles north of the city of Natchez, Mississippi. Just prior to the collision, the automobile driven by Murray, and in which Underwood was a passenger, was traveling in a southerly direction and the train had been traveling in a northerly direction. The extent of the traffic on the part of the railroad between Natchez and Harriston, a town about twenty-eight miles further north, was one freight train each twenty-four hours from Natchez to Harriston and return, with no passenger trains running on that part of the railroad. Both the highway and the railroad ran in a northerly and southerly direction. North of the crossing, the highway was on the west side of and almost parallel to the railroad until it got close to the crossing, when it made a left curve, went across the railroad, then a right curve and continued to go south. The highway was practically straight for a distance of 225 feet just north of the crossing, though the investigating officer testified that in his opinion a car coming around the curve would be only about 150 feet away from a train occupying the crossing when the automobile lights first shone on the train. At a point on the west side of the highway fifty-six feet north of the crossing was a sign reading 'Stop, Mississippi Law', and at a point seven hundred twenty feet north of the crossing was another sign reading 'Railroad Crossing'. At the point of the crossing there was a thirty-four degree angle between the railroad and the highway.

"There is a side track on the east side of the main line of the railroad just south of the crossing, at such distance that the part of the main line between the highway and the switch will hold a locomotive and a railroad car. As the train proceeded northerly, the engineer brought it to a stop before reaching the crossing, uncoupled the engine, backed into the siding, and picked up a box car loaded with pulpwood. He then pulled out on the main line, backed in to recouple with his train, and had proceeded on northerly to a point where the collision occurred. The automobile ran into the eighth car of the sixteen car freight train.

"There was no dispute as to the facts thus far stated. Under the

**I.** Underwood v. Illinois Central Railroad Co., 5 Cir., 1953, 205 F.2d 61, 64.

evidence, the jury would have been authorized to find the following additional facts. The automobile, a new 1950 model Buick was in perfect condition, including its brakes, steering gear and lights. Murray was a good and careful driver. Murray had been on this particular section of the highway on one other occasion and Underwood had never before traveled this part of the highway. The automobile had been traveling at a speed of approximately fifty-five to sixty miles per hour with bright or driving lights on. Murray and Underwood each testified that he was awake and watching but denied seeing either of the warning signs. They both saw the train for the first time when the lights of their automobile shone on the railroad car, but Murray's efforts then to avert the collision were unavailing."

The former opinion then proceeded with an extended quotation from the engineer's testimony, but we end the quotation at this point for the reason that the testimony quoted in the former opinion was taken from an exploratory deposition taken by appellees some months before the first trial, while this time the engineer testified in person,[2] being examined by the railroad's attorneys for the first time. Based exclusively upon the deposition testimony of the engineer including his estimate as to how far his train ran after application of the brakes in emergency, we concluded before that "the automobile would have been somewhere between 300 feet and *800 feet* north of the crossing when the engineer applied the brakes." We further concluded that, "The engineer north of the crossing *may have had a clear view of*

*highway traffic moving south,* while the train and the lights on the engine may not have been obvious to the operator of the motor vehicle." [Emphasis supplied in each instance.]

Based upon the testimony at the former trial and the quoted assumptions we found then to be sustained by it, we concluded that the Court below had committed error in directing a verdict in favor of the railroad company at the end of appellee's testimony, citing the rule of law recognized by the Supreme Court of Mississippi:

"When the engineer saw and appreciated the peril, it was his duty to use every reasonable means to prevent the collision."

In the former opinion we recognized that the Supreme Court of Mississippi had, in a long line of decisions, recognized the rule that the presence of a train of cars making legitimate use of a crossing is, of itself, sufficient warning to approaching motorists.[3] We pointed out, however, that, in the case of Boyd v. Illinois Central Railroad Co., 211 Miss. 409, 52 So.2d 21, the Mississippi Court had recognized that exceptional circumstances might exist at the crossing which would warrant the non-application of the rule. The exceptional circumstances there existing were that the railroad had not, as required by law,[4] provided the Mississippi Stop Sign, that there was a dip in the road a short distance away from the intersection and a down-grade just before reaching the main track, deflecting downward the lights of approaching automobiles; that the railroad had stopped a flatcar straddle the crossing, which presented to the oncoming motorist a view only of the side of a sill about fifteen or eighteen inches across; and that Boyd, realizing that he was ap-

2. In addition to the deposition which was again used by appellees.

3. Gulf, M. & N. R. Co. v. Holifield, 152 Miss. 674, 120 So. 750; Spillman v. Gulf & Ship Island R. R. Co., 173 Miss. 725, 163 So. 445; Gulf, M. & N. R. Co. v. Addkison, 189 Miss. 301, 194 So. 593; Summerford v. Illinois Cent. R. Co., Miss.,

196 So. 264; Gulf, M. & N. R. Co. v. Kennard, 164 Miss. 380, 145 So. 110; Mississippi Export R. Co. v. Summers, 194 Miss. 179, 11 So.2d 429, 905. And cf. Pollard v. Davis, 5 Cir., 1938, 93 F.2d 193.

4. § 7775 Code of 1942.

proaching the vicinity of the railroad track, was looking for the stop sign to indicate when he was actually approaching the point of intersection and was lured into the danger by its absence. Our conclusion based upon that case and certain cases dealing with the doctrine of Last Clear Chance, was "Under the evidence in this case, it was open to the jury to find that the engineer saw and appreciated the peril of the appellants and the fact that they were unaware of the train in time to give warning by a blast or blasts of the whistle  *  *  * "

Upon a second trial of the consolidated cases the jury was unable to reach a verdict, and upon a third trial the jury found in favor of appellee Murray in the sum of $5,000 and of appellee Underwood in the sum of $45,000. The Court below tracked our former opinion meticulously and no errors are assigned in connection with its charge. But we think that the Court below erred in denying the railroad's motion for a directed verdict at the end of all of the evidence for the reason that the evidence in this case met and repelled the assumptions quoted above upon which the case was decided on the former appeal.

In this case the testimony of appellees was somewhat different from what it had been in the first trial, all of the members of the train crew testified, both on direct and cross-examination, showing full performance of the duties laid upon them by law; the engineer amplified the testimony he had given on ex parte examination by appellees' attorney; and, in addition, evidence was admitted without objection of experiments conducted by engineer Mobley and others which demonstrated that it was physically impossible for him to see appellees' car at a sufficient distance from the point of collision to warrant the finding that it was reasonably probable that the engineer could have done anything to prevent the accident. This experimentation and the measurements developed by it furnished by far the most important additional evidence and will be discussed fully below.

The evidence here shows without dispute that the concrete highway upon which appellees approached the point of collision was substantially level (1.13 percent grade); that the curve to the left was very slight (1° 30') and reached a straightaway 222 feet from the railroad track; that appellees faced a reflective type crossing sign, two and one-half feet in diameter with the top five feet from the ground, 675 feet from the crossing and the regular Mississippi Stop Sign 56 feet from the crossing, both of which signs were, by the slight curve, thrown directly into the rays of the car headlights. It was further undisputed that a series of moving railroad cars were passing along in front of appellees which these sketches show would have been clearly visible to one looking even before the straightaway was reached; that the car had perfect headlights, and the night was dark but clear.

On the first trial both appellees indicated that they had not seen the train until they were "right on it", and they were inclined at the outset to repeat pretty much the same thing on this trial. But Murray, the driver, stated on cross-examination that, in his best judgment, he saw the train "whenever them lights picked it up—whatever length of the lights was." Thereupon, the Court took up the examination with this result: "The Court: The average city block is about three hundred feet. Can you give us in terms of a city block how far you were; a third of a block or a half a block? The Witness: About a half block. The Court: About a half a block? The Witness: Something like that." Following that, he was asked by the railroad attorney if he meant about one hundred fifty feet, and he answered, "Something like that, yes, sir." Both appellees made it plain at this trial that they were acquainted with and understood the meaning of the reflector type sign which was 675 feet from the crossing.

It was further undisputed that the lights were up or in "bright" position,

and Mississippi Law required that they be such as "to reveal persons and vehicles at a distance of at least 350 feet ahead for all conditions of loading." [5]

■ It is plain, therefore, from the undisputed testimony that a motorist who was looking ahead as required by law would be bound to see the reflective type sign 675 feet away, the Mississippi Stop Sign located as required by law, and the moving freight cars when the automobile was not less than 350 feet from the point of impact.[6] The only conclusion which can be drawn is that these appellees were paying no attention to road signs or to the road itself; but they were "charged with having seen what was so plainly open" to them. Deitz v. Greyhound Company, infra.

The experiment which furnished such important testimony at the trial below was conducted by placing at several points along the track, a railroad engine of the same type as that in use the night of the accident and pulling freight cars of like kind, and having the witness McCullough take his position on the highway to determine the points at which he could be seen by engineer Mobley. The latter took his seat on the right side of the engine exactly as he was on the night of the accident. The boiler and other superstructure of the engine made it impossible for him to see any part of the highway by looking out of his own window. By looking across, past the end of the boiler, he could see a small segment of the highway through the fireman's window. It was undisputed that, on the night of the accident, he was engaged in observing portions of the mechanism he was required to inspect in the cab of the engine when his eyes caught the flash of the automobile's headlights as he was able to observe it through the small fireman's window. The crucial question in the case throughout has been, where exactly was the Murray car when the engineer first saw it? This question was answered by exact measurements made in the experiment which duplicated precisely the situation at the time of the accident.

The engine was stopped when it was three car lengths from the center of the crossing, and Civil Engineer McCullough walked up the highway until Locomotive Engineer Mobley motioned him to stop. McCullough was then 200 feet from the point of collision. The engine was thereupon stopped when it was six car lengths from the crossing, and McCullough walked up the highway until Mobley stopped him, and that point was 392 feet from the point of impact. By the same means it was determined that, when the engine was eight car lengths from the crossing, McCullough was visible 503 feet from the point of impact, and when the engine was nine car lengths away McCullough was visible 558 feet from that point.[7]

This experiment proved that Engineer Mobley, focusing his eyes and centering his attention exclusively on McCullough could see him in the day time as he stood on the road at the points mentioned. This removed from the realm of speculation all doubt as to when Mobley could possibly have seen the car the night of the accident, assuming that his attention was centered upon it at the first fraction of a second it became visible.

5. 6 Miss.Code 1942, § 8240, 1954 Cumulative Supp. § 8229–11.

6. Under Mississippi decisions a motorist is bound to keep his car under such control that he can stop within the range of vision afforded by his lights and has no right to assume that the road ahead of him is clear. Planters Wholesale Grocery Co. v. Kincaid, 1951, 210 Miss. 712, 50 So.2d 578, 583; Jackson City Lines v. Harkin, 1948, 204 Miss. 707, 38 So.2d 102, 104;

Rhodes v. Fullilove, 1931, 161 Miss. 41, 134 So. 840, 843 and cases therein cited.

7. The conductor testified that the marks showing where the automobile struck the train were on a red box car which was the ninth car from the engine and his testimony was corroborated by that of other witnesses and is made certain by the photographs in evidence showing the marks of the impact. He further testified that the train stopped with the twelfth car on the

By measurements, therefore, which, under Mississippi Law, we must accept to the exclusion of mere estimates,[8] it is demonstrated that, *at the time of impact*, it was a physical impossibility for the engineer to see an automobile on the road further than 558 feet from or 6.36 seconds before, the instant of impact. Even if it should be supposed that the engineer first got a glance of the automobile when it was 6.36 seconds from the collision (in other words, eliminating the known fact that it had to traverse the distance between the point of supposed sight and the point of collision), the evidence would not be sufficient to establish that it was reasonably probable that the engineer, acting as the average prudent man under the circumstances, could have done anything effective to rescue appellees from their self-imposed peril. But it was further undisputed that the automobile was traveling at sixty miles per hour, or eighty-eight feet per second, and that the engine was moving ten to fifteen miles per hour, so that the time at which it was physically possible for the engineer to see the automobile must be moved nearer the collision point at least two to four seconds.[9]

Moreover, appellee Murray testified that, "Maybe a second or two" elapsed between the time he first saw the train, thinking it was a wagon which he could go around, and the time he discovered it was in fact a train.[10] He had told the Court that the distance was about 150 feet; which tends to verify that the time lapse was between one and two seconds between the time he discovered the presence of the obstacle in his path and "hit my brakes" and the time of collision.[11]

The facts established by the maps, photographs, and actual measurements demonstrate, therefore, that Engineer Mobley had only two to four seconds to act effectively to prevent the collision after his first glimpse of the car. He testified that he saw the car only as it flashed by the fireman's window and passed out of his sight. He called to Brakeman Gibson, who was occupying the fireman's seat on the side of the engine towards the road,[12] and asked if the car was going to stop. Gibson, who was keeping a lookout ahead as required

8. " 'The testimony even of disinterested and unimpeached witnesses on the subjects of measurements, distances and the like, which is based merely on memory, estimate or casual observation, must yield to that which is based on actual measurement.' " S. H. Kress & Co. v. Sharp, 1930, 156 Miss. 693, 126 So. 650, 651, 68 A.L.R. 167; and see Hardaway Contracting Co. v. Rivers, 1938, 181 Miss. 727, 180 So. 800, Mobile & O. R. R. Co. v. Bryant, infra, and 32 C.J.S., Evidence, § 492.

9. This calculation would verify the estimate made by Engineer Mobley and Brakeman Gibson that the automobile was between three and four hundred feet from the crossing when Mobley first saw it and called to Gibson. This was the only testimony on the subject, and represents nothing but their estimates which, under the circumstances, have probative value only as they are corroborated by facts established by such means as measurements and photographs.

10. "Q. You are telling this Court now that just as soon as you saw this box car you turned to the right and put on your brakes; is that right? A. Yes, sir. Q. How many seconds would you say elapsed from the time you thought it was a wagon going along the road that you discovered it was a box car? A. Maybe a second or two. Just as soon as I saw a box car, I knew it wasn't a wagon. Q. You were going approximately 60 miles an hour when you first thought this was a wagon; is that right? A. Yes, sir. Q. And you continued on at that speed until you made up your mind it wasn't a wagon and realized it was a box car; is that right? A. I hit my brakes. I didn't want to run into a wagon on either. * * * "

11. A chart published by "Affiliated Aetna Life Companies" and distributed generally in the State of Mississippi by the Department of Public Safety shows that the average driver moving at sixty miles per hour, requires a distance of 226 feet—substantially the length of the straight stretch of road—to stop an automobile after "danger is first perceived."

12. The fireman was putting in a fire and did not see the car, but heard the conversation.

by his duties, had to turn around and look backward along his train and he saw that the car was too close to the train and was moving so fast that it could not be brought to a stop, and he replied with an immediate "No." From this it is clear that the automobile had passed the "point of no return," 226 feet, when the engineer received the warning.

■ This was the first moment that the law or the dictates of humanity required action on the part of Mobley. Action required prior realization and evaluation of the peril, decision as to what was best to do, and doing what judgment dictated. The engineer, controlling a heavy mechanism whose nature was to do harm chiefly by its movement, set about to stop that movement. This involved throwing his throttle into neutral—he was working steam, bringing his speed up to its norm—and seizing the brake lever and placing it in the notch best adapted to accomplish the quickest stop consistent with safety.

He testified that there was not time to do more. And who can advance convincing argument that the engineer did not, in the emergency he faced because of appellee's negligence, do what was reasonably required of the average prudent man under the circumstances? Certainly not the Supreme Court of Mississippi, which, under quite similar circumstances has held in more than one case that the time element thus accurately fixed in this case was not enough to fasten liability under the doctrine of Last Clear Chance.[13]

The case of Brookhaven Lumber etc. Co. v. Illinois Central Railroad Co.,[14] cited and quoted from as announcing the Mississippi rule as to action in emergency, by the Mississippi Supreme Court in Vann v. Tankersly, 1933, 164 Miss. 748, 145 So. 642, involved the action of an engineer who discovered, when a distance of 300 feet away and when he was running 35 miles per hour, that a switch was open. He did not act effectively to reduce the speed of his train until it had passed through the open switch. The result was that the engine plowed into a lumber mill and set it afire, and destroyed it. In the suit brought against the railroad—in which the evidence showed that its employees had not left the switch open—complaint was made of the failure of the trial Court to give an instruction fixing liability upon the railroad if the engineer actually discovered the open switch in time to avoid the ensuing collision and failed to utilize the means at hand to avoid it.[15] The Mississippi Supreme Court approved the rejection of that instruction, holding *as a matter of law* that six seconds was not an unreasonable time in which to size up the unexpected situation and act to prevent the impending catastrophe. Its words are found on page 69 of 10 So.:

"Of course, if the engineer had reasonable time and *fit opportunity* to prevent the impending calamity, and failed to do so, the appellee is liable; but in the case at bar, with its facts finally resolved, if liability is to be raised, *about six seconds must be held reasonable time in*

13. It should be borne in mind that Mississippi has a comparative negligence statute, § 1454, Code of 1942, and that contributory negligence, however great, never bars recovery. The doctrine of discovered peril or last clear chance, so important in states where contributory negligence is a complete defense, loses most of its meaning and importance in Mississippi. This explains why most of the cases applying the doctrine are old cases.

14. 1890, 68 Miss. 432, 10 So. 66.

15. The refused instruction was in these words: "'The court instructs the jury that, although they may believe from the evidence that the switch was open through no negligence of the railroad company, yet if they believe further from the evidence *that the engineer discovered that the switch was open while at a sufficient distance therefrom to have stopped the train before its collision* with the lumber-shed, and that, though discovering the danger, he *failed to resort to such appliances* as, if resorted to, would have prevented such collision and consequent fire * * * then the failure to stop the train was such negligence as to render the defendant railroad liable for any injury to plaintiff's property that so resulted.'" [Emphasis supplied.]

*which to make ready to use* the various appliances for stopping a train, and in which to actually put into effective operation such appliances, (for the train would be in the very jaws of the open switch in about six seconds from the time of its discovery by the surprised engineer) * * * But we forbear to press remark further on this point, and content ourselves by saying that the engineer was only required to act in view of what he then saw, situated as he was, and that, suddenly and unexpectedly confronted with a complicated difficulty impossible to have been foreseen, he is not to be held accountable for failure to exercise that cool and unembarrassed and unerring judgment which we, freed from sudden surprise and danger, could now form and execute. He appears to have done the best he could, situated as he was, and nothing more could reasonably be required of him." [Emphasis added.]

Concluding as a matter of law that three seconds did not give an engineer time enough to do anything to prevent a crossing accident, the Supreme Court of Mississippi reversed and dismissed a judgment based upon a jury verdict awarding a large amount for the death of a lady at a public crossing.[16] A number of eye witnesses gave conflicting versions of what actually happened, but the Mississippi Court pushed them aside because it had photographs and actual measurements from which the determining facts were established. We quote a portion of the opinion found on pages 540 and 541 of 132 So.:

"The maps and photographs, together with the testimony in respect to actual measurements, show that the distance from the center of the road, where the curve begins for the crossing, to the main line track is forty-three feet. * * * This placed her, therefore, when she began to negotiate the turn, within less than forty feet of the track on which she was hit. Consequently, *only three seconds elapsed* from the time she turned westward into the crossing until she arrived on the main line track and was struck.

"It would require some moment of time after the driver of the automobile had begun the turn into the crossing for the impression or conclusion or realization to register upon the mind of the locomotive engineer that the said driver did not intend to stop; it would require a second for the engineer to get hold of and turn the brake valve, and another second to triple, and for the brakes to take hold, in response to the said valve, the said latter propositions being undisputed in the evidence, and then, as a matter of common sense, certainly another second would intervene before any appreciable response in the reduction of speed of a train running twenty-five miles an hour would result. Thus the three seconds of time that were available here would have elapsed without any reasonable possibility, to say nothing of probability that within his hopelessly short time anything effectual could have been done by the engineer to avoid the collision. *Three seconds are only one breath in the respiration of a normal person.* Let us look at the second hand on a watch and consider how futile that space is for the effectual checking of a railroad train. * * *

" * * * 'It is to be observed also that these instructions are capable of the construction that it was the duty to maintain a lookout beyond the right of way and to anticipate that a person traveling in proximity thereto would, without taking any precaution in his own behalf, drive suddenly upon the track. A large part of the railroad mileage in this state is skirted on one side

16. Mobile & Ohio Railroad Co. v. Bryant, 1931, 159 Miss. 528, 132 So. 539.

or the other by highways with numerous crossings leading therefrom. It is enough to say, without more, that, if this character of lookout were required, there would be, in order to avoid possible liability, an intolerable recurrence of the throwing on of emergency brakes and an inadmissible interference with the efficient movement of the commerce of the country.'

"* * * These photographs disclose the facts to us by way of demonstration, and we apply the law to the facts thus demonstrated—any verdict to the contrary notwithstanding. * * *

"The facts of this case, when examined with impartial reason, under the law, are not sufficient to sustain a verdict against the appellant. The judgment is therefore reversed, and the case dismissed." [Emphasis added.]

■ Sitting, as the Court below was and as we are, as a Mississippi Court,[17] we are bound by the Mississippi law as thus announced by its Supreme Court. The cases making similar holdings are numerous,[18] and the Mississippi rule is not out of line with that generally applied. We recently held that liability under the Last Clear Chance doctrine was not established sufficiently to warrant submission to a jury in a case where a bus driver was charged with failing to utilize a three second interval in which he was forced to act in such a way as to avoid killing the driver of a Buick automobile.[19]

Deitz, the man who was killed, entered a highway upon which the bus was running at fifty-five miles per hour, at a point two hundred thirty feet in front of the bus. The bus driver assumed that the Buick would turn to its right and proceed in the same direction the bus was moving, and accordingly the driver pulled over into the left lane to pass the Buick. It developed instead that the Buick driver intended to cross over and turn to his left into the left lane which the bus had occupied, with the result that the bus struck the Buick and killed the driver. It was fervently argued that, if the bus had continued in a straight course instead of pulling to its left, the accident would have been avoided and that the bus company was liable because its driver negligently elected to take a course which turned out to be the wrong course. We analyzed the facts as demonstrated by the sketches, the photographs and the measurements, considered the speed at which the respective vehicles were moving, and the number of seconds thus demonstrated as available for action, and gave those established facts dominance over inconsistent statements by the bus driver and other countervailing testimony, and concluded that, as a matter of law, the doctrine of Last Clear Chance had not been made applicable by the evidence.[20]

■ This conclusion was reached under Louisiana Law where contributory negligence is a complete bar to recovery and whose Last Clear Chance doctrine is much more liberal in favor of recovery than in Mississippi. For instance, under Louisiana law the test is applied from the point where the party charged ought to have discovered the peril.[21] In

---

17. Angel v. Bullington, 1946, 330 U.S. 183, 67 S.Ct. 657, 91 L.Ed. 832.

18. E. g., Mobile & O. R. Co. v. Johnson, 157 Miss. 266, 126 So. 827, Id., 165 Miss. 397, 141 So. 81; and Hancock v. Illinois C. R. Co., 158 Miss. 668, 131 So. 83.

19. No. 15909, Deitz v. Greyhound Corp., 5 Cir., 1956, 234 F.2d 327.

20. Our conclusion was: "There is no showing of any evidence that at its speed, in this situation, the bus could then have stopped, or, in that fleeting moment, it could or ought to have pulled to the right instead of the left. For it to have been a Last Clear Chance in law, the plaintiff must prove it to have been one in fact with a means actually open to the bus which, consistent with equally dominant necessity of safety to its own passengers, prudence required it to take." [Emphasis supplied.]

21. Cf. Rottman v. Beverly, 1935, 183 La. 947, 165 So. 153; Jackson v. Cook, 1938,

Mississippi there must be a "clear" chance after the peril is actually discovered and actually appreciated. See Mississippi cases cited and quoted from in our former opinion, 205 F.2d 63–64.[22]

We have, in other cases, so applied the doctrine of Last Clear Chance as to require that we declare it inapplicable to sustain a recovery here.[23] And the Court of Appeals of the Second Circuit held that an instruction on Last Clear Chance ought not to have been given where the interval in which a motorist could act was only three seconds.[24]

To recover under the Last Clear Chance doctrine it was incumbent upon the appellees to show not only that the engineer failed to act with due care after appreciating the danger, but that he had means available by which he could have taken steps which would probably have avoided the collision. Appellees claim that the engineer ought to have

blown his whistle in addition to or instead of stopping the train when the peril was discovered. Aside from the rule which relaxes strict requirements of care when acts are performed in emergency, so liberally applied in Mississippi,[25] any conclusion that the blowing of the whistle would have avoided the injuries would be based entirely upon speculation. The best answer to that argument is furnished by the language of the Supreme Court of Mississippi in New Orleans and N. E. R. Co. v. Burge, 1941, 191 Miss. 303, 2 So.2d 825, 826.

Burge claimed that he ran into the side of an engine at a public crossing, not seeing the locomotive until he was within about four feet of it, which he attributed to the fact testified to by him that the statutory whistle and bell signals were not given as the train approached the crossing. The case was submitted to a jury which returned a

189 La. 860, 181 So. 195; Bergeron v. Department of Highways, 1952, 221 La. 595, 60 So.2d 4; Brown v. Louisville and N. R. Co., D.C.E.D.La., 1955, 135 F.Supp. 28, affirmed 5 Cir., 1956, 234 F.2d 204.

**22.** All of the Mississippi cases cited here involved the action of railroad operatives *in running trains into persons*—mostly at crossings—who had gotten themselves into perilous positions in front of moving trains. No case has been cited or found where the doctrine of Last Clear Chance has been applied against the party charged with negligence, having no legal duty with respect to the person injured, who has *failed merely to warn* the injured party of the *presence* of the instrumentality located where it had a right to be, and being operated without negligence.

**23.** See e. g., Lapuyade v. Pacific Employers Insurance Co., 5 Cir., 1953, 202 F.2d 494; Atlantic Coast Line Railroad Co. v. King, 5 Cir., 1952, 196 F.2d 999; Humphries v. Boersma, 5 Cir., 1951, 190 F.2d 843; and Schoen v. Western Union Telegraph Co., 5 Cir., 1943, 135 F.2d 967.

**24.** Mulberg v. Mason & Dixon Lines, 2 Cir., 1946, 157 F.2d 805, 806: "The inapplicability of the doctrine to the facts of the case at bar appears to us to be obvious. No danger of collision was apparent to the truck driver until the Mulberg car began to skid when it entered the south end of

the bridge. From that point to the point of impact the automobile traversed about 225 feet while the truck was covering * * about 100 feet * * *. While the jury was not bound to accept the testimony as to the precise location of the respective vehicles or their rates of speed—60 miles an hour for the automobile and 35 for the truck—*it could not construct a situation out of whole cloth; * * *. Harris had only about three seconds in which to act after the time for action arrived.* Consequently it would have been erroneous to *let the jury conjecture* that he could have avoided the accident by exercising reasonable care after he became aware of the danger. * * *" [Emphasis added.]

**25.** This liberality is well illustrated by Vann v. Tankersly (1933) supra, where an eighty-year-old man backed into and seriously injured a person seated on a bench on the sidewalk. Vann was backing his car out from the curb when his wife, seated beside him, began falling out of the door she had failed to fasten securely. Lunging to seize hold of his wife, Vann lost his head, pressed hard on the accelerator, turned loose the steering wheel and backed rapidly across the sidewalk and into the wall of a store. The jury awarded Tankersly, badly injured, a verdict. The Mississippi Supreme Court reversed and rendered judgment in Vann's favor.

verdict in plaintiff's favor and the Supreme Court reversed and rendered judgment in favor of the railroad company:

"* * * it puts an intolerable strain on credulity that reasonable men should be asked to believe, * * * that as a matter of reasonable likelihood the ringing of a bell on that locomotive would have substantially contributed to an effective awareness on appellee's part. * * * Of such a state of facts could men of sound discretion, acting impartially, say with real reason otherwise than that it was highly probable that, if the locomotive bell had been rung, there still would have happened to appellee, so far as he was concerned, what did happen?"

After discussing the fact that the injured man did not see the headlight and did not hear the roar of the train, the Mississippi Court concluded with this language:

"The problem becomes, then, one of the quantum of proof and the burden of proceeding therewith. And as in all other cases, possibilities and conjectures are excluded from the equation. *It is not enough for the injured person, who has primarily the burden of the proof, to say that had the required precautions been taken by the opposite party, the injury might possibly have been avoided, or to propound a conjecture to the same effect. * * *

"To say on the record in the present case that had the required sig-*

nals been given the injury would not have occurred is to invoke a possibility or conjecture, and it is not within the legitimate province or power of a jury to convert a possibility into something more by the mere force of a verdict. Teche Lines, Inc. v. Bound, 182 Miss. 638, 649, 179 So. 747. * * * In view of what is disclosed by this record taking all that the plaintiff says as true together with the undisputed physical facts it is clear as a matter of all reasonable likelihood that appellee would not have heard the bells if two instead of one had been rung. The facts amount practically to a demonstration that he was both deaf and blind to everything except what he himself was doing, his sensibilities were in an evident state of unresponsiveness to all else; and thus the failure to ring the bell * * * disappears as a substantial factor in bringing about the injury; hence appellee cannot recover. Reversed and judgment here for appellant." [Emphasis added.]

■ Under the Mississippi cases discussed, and accepting as we must the plats, the photographs and the measurements about which there is no dispute, to the exclusion of pure estimates in conflict therewith,[26] it is plain that appellees did not make a case against appellant and that the Court below should have directed the jury to find for the appellant. For its error in failing so to do the case is reversed and a judgment rendered here in favor of appellant.

Reversed and rendered.

---

26. The undisputed and credible evidence given at this trial and the measurements newly furnished by the experiment destroy the assumptions of fact—quoted at the beginning of this opinion—upon which we based the conclusions announced in our decision following the first trial. Those assumptions were predicated largely on testimony, then undisputed and unquestioned, concerning estimates of how far the train probably ran after the brakes were applied. On this trial it appeared that those were mere guesses, based upon the average time normally consumed in such a step. The measurements and the amplified testimony here demonstrated that those estimates had no probative worth.