**DE ZON v. AMERICAN PRESIDENT LINES, Limited.**

**No. 9984.**

Circuit Court of Appeals, Ninth Circuit.

July 3, 1942.

Andersen & Resner, of San Francisco, Cal., for appellant.

Treadwell & Laughlin, Edward F. Treadwell, and Reginald S. Laughlin, all of San Francisco, Cal. (A. Thatcher Cook and Charles M. Haid, Jr., both of San Francisco, Cal., of counsel), for appellee.

Before GARRECHT and HEALY, Circuit Judges, and FEE, District Judge.

GARRECHT, Circuit Judge.

This action, brought by Joseph DeZon under the Jones Act, 41 Stat. 1007, 46 U.S. C.A. § 688, was heard in the District Court of the United States for the Northern District of California, Southern Division. The grievance complained of is that defendant-appellee, American President Lines, Ltd., "negligently and carelessly failed and refused to provide plaintiff with adequate and sufficient medical care and attention * * * with the result that the infection to plaintiff's right eye grew steadily worse until * * * it was necessary to remove the eye". A verdict directed for defendant was returned by the jury, and from the judgment entered thereon plaintiff has appealed.

The pertinent facts of the case are these:

Plaintiff was a seaman aboard defendant's vessel, S. S. "President Taft", and on or about June 3, 1940, at approximately ten o'clock in the morning, while chipping away old paint and repainting in the boiler room, in pursuance of his duties, plaintiff got a chip of paint in his eye and also some fresh paint from his brush. Immediately he went to his quarters, where he washed out his eye with some eyewash which he had. That evening he stood his watch, although he didn't feel very well. In the morning, because his eye pained him, he consulted the ship's physician and surgeon, Dr. Will Lewis, who was a general practitioner, and explained to him about the chip of paint getting into his eye. Upon examination of the eye the doctor found it red and inflamed, as is usual when there has been irritation by a foreign body; he diagnosed the condition as acute conjunctivitis—a term used to designate an inflammation of the conjunctiva or outer coat of the eye—which ordinarily clears up in two to four days, and gave the proper treatment for such condition. In addition, he recommended that plaintiff be relieved from duty, which was done. About four o'clock that afternoon the ship arrived in Honolulu, on its way from the Orient to San Francisco, California, and after it had docked, plaintiff went to the Marine Hospital there, but upon finding it closed proceeded to the Queen's Hospital in the same city, where he saw a Dr. Yap, whom plaintiff refers to as a "competent physician". That doctor, after making a thorough examination, diagnosed the condition as "acute traumatic conjunctivitis", and treated the eye in the same manner as had Dr. Lewis earlier in the day. Plaintiff then returned to the "President Taft", where he was placed in the ship's hospital by the orderly on duty. At about eleven-thirty o'clock that same evening, when Dr. Lewis came back aboard, approximately a half hour before the ship departed for San Francisco, as per schedule, he visited plaintiff, who claims that he then told Dr. Lewis that Dr. Yap had advised shore hospitalization. Plaintiff testified further that he told Dr. Lewis that he preferred to go to San Francisco; that when he inquired about the advisability of so doing, the doctor answered that there was no danger; and that he then agreed

to make the journey. The ship's doctor testified that he had no recollection of any such conversation with DeZon, and expressed doubt as to whether it had taken place. At any rate, a bed in the ship's hospital and surgery was assigned to plaintiff, where he remained during the five-day voyage to San Francisco, upon arrival at which port he was taken to the United States Marine Hospital there. While hospitalized aboard the ship, he was served all his meals in bed, was visited and treated by the ship's doctor several times a day, was given almost constant attention by the ship's male nurse, and was given the treatment deemed appropriate by the ship's doctor, the physician at Honolulu, and an army surgeon with extensive experience in the Orient with eye infections, who was aboard ship and was called into consultation by the ship's doctor. Plaintiff's condition did not improve, but grew worse. Eye specialists at the Marine Hospital in San Francisco conducted extensive examinations, and after five days determined that plaintiff was suffering, not from acute conjunctivitis, but from intraocular hemorrhage. The eye failed to respond to the treatment rendered at said hospital, and on July 5, 1940, the organ was enucleated.

Plaintiff called as a witness Dr. Percival E. Faed, a physician at the United States Marine Hospital in San Francisco, who had attended DeZon most of the time that he was in said hospital and had removed his eye. This witness testified concerning the manner in which plaintiff's eye was treated while at that hospital (which varied from that administered to plaintiff aboard ship), and stated that in his judgment similar treatment should have been given to DeZon when he first reported to Dr. Lewis, because such treatment might "possibly" have helped plaintiff's condition. When asked whether DeZon should have been hospitalized on June 3 or 4, 1940, when the ship was at Hawaii, Dr. Faed said that he would have advised it from what he knew of the case, that "it might have helped some". A witness for defendant, Dr. Jerome Bettman, a specialist in ophthalmology, stated that he believed that the use, at the outset of plaintiff's disorder, of atropine, a drug employed for purposes of dilating the eye so as to put the small muscles inside the eye at rest and to prevent adhesions of the iris and lens, which drug was used by the San Francisco Marine Hospital in caring for DeZon and which is not ordinarily carried by the general practitioner, would have aided. He testified further that under the facts and circumstances it was "too much to expect of the average general man to be certain that this case is or is not serious, or to be certain of the diagnosis within a relatively short time", but that because there was no special eye equipment on the ship and all facilities were available at the Honolulu hospital, he "as a specialist, would have referred him [DeZon] to the hospital".

Plaintiff's case is based, in particular, upon a consideration of the matter set out in the paragraph next above. He phrases his contention in these words: "The failure to leave DeZon in Honolulu under these facts constitutes a clear case of negligent failure to provide proper medical care, however the case may be viewed."

Preliminarily to instructing the jury on defendant's motion for a directed verdict, the court, in discussing the matter with counsel, remarked: "Now, from what was placed before me in regard to the treatment of the man I don't see any criticism on it. The only adverse testimony that appears on that that I recall is that of this doctor [Dr. Faed] that was in the Government Service, here, and that doctor, of course, did testify to this effect: He said he didn't know whether it would benefit him or not benefit him, but the very fact that he didn't know—in other words, that the balance was so equal he thought he would give the advantage to the man and not let him go with the ship. But that much testimony would not establish the fact that the doctor, in his administration of his functions as a doctor, was acting negligently."

And afterwards, when addressing the jury, he remarked that "A mistake of a doctor, even, in the pursuit of his profession, is not necessarily negligence". Then, after summing up the evidence, he concluded: "Now, can you read in that that a doctor employed by the company by having a view one way or the other was negligent unless he didn't follow the view he thought was necessary? There are other features in the case, but I could not find negligence, something that you can condemn as should not have [been] done by a man of the profession, so as to bring the responsibility of that negligence home to the company, and therefore I am going to instruct you at this time that you retire to the jury

room and return a verdict in this case in favor of the defendant. * * *"

Here on appeal plaintiff argues that "The verdict is contrary to the evidence in that taking the case in the most favorable light to appellant, as must be done since the verdict was directed against him, there was sufficient evidence upon which the jury could have found for appellant".

Very recently, in the case of Deere v. Southern Pac. Co., 9 Cir., 123 F.2d 438, this court had occasion to discuss the propriety of a federal trial court's action in granting a motion for a directed verdict. The following excerpt is taken from that opinion at page 440 of 123 F.2d:

"'The test as to whether a directed verdict should be granted, is not whether the evidence brings conviction in the mind of the trial judge; it is whether or not the evidence to support a directed verdict as requested, was so conclusive that the trial court in the exercise of a sound judicial discretion should not sustain a verdict for the opposing party.' O'Brien, Manual of Federal Appellate Procedure, 3d Ed., p. 15. Respecting the power of the trial court to grant or deny a motion for directed verdict the Supreme Court of the United States stated in Gunning v. Cooley, 281 U.S. 90, 91, 50 S.Ct. 231, 233, 74 L.Ed. 720, as follows:

"'"When on the trial of the issues of fact in an action at law before a Federal court and a jury, the evidence, with all the inferences that justifiably could be drawn from it, does not constitute a sufficient basis for a verdict for the plaintiff or the defendant, as the case may be, so that such a verdict, if returned, would have to be set aside, the court may and should direct a verdict for the other party." Slocum v. New York Life Insurance Co., 228 U.S. 364, 369, 33 S.Ct. 523, 525, 57 L.Ed. 879 (Ann.Cas.1914D, 1029).

"'A mere scintilla of evidence is not enough to require the submission of an issue to the jury. * * *'"

As mentioned at the beginning of this opinion, this action is brought under the Jones Act, 41 Stat. 1007, 46 U.S.C.A. § 688. So far as material to this case it reads: "Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply; * * *."

The construction of this statute was involved in Cortes v. Baltimore Insular Line, 287 U.S. 367, 53 S.Ct. 173, 77 L.Ed. 368. Speaking for the court, Justice Cardozo said at pages 377, 378 of 287 U.S., page 176 of 53 S.Ct.: "The act for the protection of railroad employees does not define negligence. It leaves that definition to be filled in by the general rules of law applicable to the conditions in which a casualty occurs. * * * Congress did not mean that the standards of legal duty must be the same by land and sea. Congress meant no more than this, that the duty must be legal, i. e., imposed by law; that it shall have been imposed for the benefit of the seaman, and for the promotion of his health or safety; and that the negligent omission to fulfill it shall have resulted in damage to his person. When this concurrence of duty, of negligence and of personal injury is made out, the seaman's remedy is to be the same as if a like duty had been imposed by law upon carriers by rail."

As is the case with railway workers on interstate lines under the provisions of the Federal Employers' Liability Act, 35 Stat. 65, 45 U.S.C.A. §§ 51–59, Congress has, by the Jones Act, afforded seamen "a modified common law remedy for negligent injury, and the modifications were in favor of the employee, in that the fellow-servant or common employment defense was done away with, the assumption of risk defense was much weakened, and the contributory negligence rule was so modified that it usually results only in a reduction of the recovery, on the basis of comparative negligence". 4 Benedict on Admiralty, 6th Ed., § 612, p. 196.

We are reminded by plaintiff that this act "is to be liberally construed in aid of its beneficent purpose to give protection to the seaman and to those dependent on his earnings" (Cortes v. Baltimore Insular Line, supra, 287 U.S. 367, 375, 53 S.Ct. 173, 176, 77 L.Ed. 368), but we must also be mindful of the fact that although the Jones Act has given "a cause of action to the seaman who has suffered personal injury through the negligence of his employer" (287 U.S. 372, 53 S.Ct. 174, 77 L.Ed. 368), still it does not make that negligence which was not negligence before, does not make the employer responsible for

acts or things which do not constitute a breach of duty. "A seaman is not entitled to compensation or indemnity in the way of consequential damages for disabilities or effects occasioned by the sickness or injury, except in case of negligence". 24 R.C.L. § 218, p. 1164.

Returning now to plaintiff's allegation that defendant failed in its duty of rendering proper medical care to plaintiff in that it did not hospitalize plaintiff ashore at Honolulu, we shall first determine the extent of defendant's duty to furnish plaintiff with medical attention and then inquire whether that duty was properly discharged.

In 56 C.J. 1070, § 594, it is said: "The employer is under a duty to use reasonable care and diligence in providing a physician or surgeon competent to treat the disability incurred. But where not derelict in its duty of care and diligence in the selection of a physician or surgeon, the employer will not be responsible for damages resulting from his incompetence, negligence, nor error in professional judgment, such as a mistake in diagnosis."

In the case of The C. S. Holmes, D.C., 209 F. 970, 974, we find this language: "* * * The duty [of the owner to furnish medical care] is one which arises out of and is governed by the circumstances of each particular case, and it is only for the negligence of the owner himself, or the owner's representative, the master, that the vessel can be held. The master is not negligent when he exercises reasonable care in selecting and employs a regularly licensed physician, believing him to be competent, and intrusts the injured seaman to his care, in the belief that such physician will render careful and competent treatment."

Dr. Rodney Yoell, chief surgeon for defendant, testified that he interviewed Dr. Lewis before he was engaged by defendant; that he was satisfied with the results of the interview; that he learned that Dr. Lewis graduated from a recognized medical school; that he checked the official list of doctors licensed to practice in California and ascertained that he held an active license to practice in that state; and that as a result of inquiries concerning Dr. Lewis's reputation, he determined that he was a man of good character. There is no allegation that defendant was negligent in making its selection, nor is there any evidence showing negligence in that respect.

Further, no showing has been made that subsequent to taking Dr. Lewis into its employ, defendant became chargeable with knowledge that he was incompetent, if such were the fact. Therefore, it must be taken as established that due care and diligence were exercised by defendant to employ and retain in its service a competent physician. As was stated by this court in the case of The Korea Maru, 9 Cir., 254 F. 397, 399: "* * * with respect to the charge that the physician and surgeon was incompetent and unskillful in the treatment of Omito Itokazu we are of the opinion that the vessel was only liable when the claimant failed to take reasonable care in the employment of such an officer on board the vessel. The Great Northern [9 Cir.], 251 F. 826. It is not charged in either of the libels or the amendments that the claimant was negligent in the selection of, or in the employment of, the physician and surgeon, or that his incompetency or lack of skill, as charged, was known to the claimant at the time of his engagement, or that his incompetency and lack of skill, as charged, was subsequently ascertained by the claimant, and that with such knowledge he was retained as an employé of the vessel. In the absence of such a charge, and competent evidence to sustain it, we pass over the evidence relating to the lack of skill and competency on the part of the physician and surgeon in the treatment of Omito Itokazu."

Also, we find nothing in the record to indicate that defendant did not maintain a properly equipped ship's hospital, that is, with reference to reasonable standards.

If, as a matter of fact, the ship's doctor should have recommended to the master of the ship that DeZon be hospitalized ashore at Honolulu, as contended for by plaintiff, the most that can be predicated of this alleged failure upon the part of the doctor is that it was the result of a misjudgment. Because the shipowner exercised the proper degree of care in selecting said doctor, no responsibility attaches for his errors in judgment. We quote the following: "On board was a competent ship's physician. For his negligence the defendant was not responsible. Upon his advice, received in good faith, the master might rely. Upon it the master might act. So acting, no liability can be predicated upon error or mistake." Leone v. Booth S. S. Co., 232 N.Y. 183, 133 N.E. 439.

Even if, in some way or other, the conduct of the doctor could be said to be attributable to the defendant so that it would be answerable therefor, still no case of actionable negligence is established, no case is made out for the jury. To demonstrate that this is so we need not give a detailed discussion of the matter; a reference back to the trial court's analysis of the relevant evidence, as hereinbefore set out, is sufficient.

Because the expert testimony was to the effect that hospitalization at Honolulu "might have helped some", we believe the following quotation pertinent: "* * * The charge made against the ship's surgeon is that, there being a possibility of a fracture of the nose, which could not be detected at the time, he should have sent the libelant to a hospital at Southampton for expert treatment. I think this would be an error of judgment on his part for which the shipowner would not be liable. Besides, there is no evidence that if he had been left at Southampton the treatment there would have been different from what he received on board, or that a better result would have ensued. * * *" Geistlinger v. International Mercantile Marine Co., D.C., 295 F. 176, 177.

Plaintiff relies upon Leone v. Booth S. S. Co., supra, 232 N.Y. 183, 133 N.E. 439, as being authority for his contention that the instant case should have gone to the jury. As is shown by the hereinabovequoted excerpt from that opinion, the court recognized that the shipowner is not liable for negligence or misjudgment if the master places reliance upon the judgment and competency of a carefully selected ship's physician, to whose custody and care a seaman has been committed. The reason for the court's holding there that a case for the jury had been made out was this: the evidence showed that the master had not followed the recommendations of the ship's doctor, but instead, in the exercise of his own independent judgment, had acted contrary thereto. The instant case is distinguishable in that the plaintiff was in the hands of a carefully selected ship's physician, and there was no interference by the master with regard to what treatment or care was proper for the plaintiff.

The Korea Maru, supra, 254 F. 397, is also cited by plaintiff as support for his contention. Recovery in that case was permitted, not because the ship's doctor erred in judgment or negligently treated the claimants, but because he totally neglected to give them treatment. We do not have that situation before us. The evidence conclusively shows that the doctor was very attentive in ministering to plaintiff. Moreover, the doctor's testimony that he had treated plaintiff to the best of his ability was not questioned.

The other cases cited by plaintiff for the purpose of proving his contention that he should have been given shore hospitalization immediately are not in point. The distinction lies in the factual situations presented. Most of them involve instances in which there was no ship's physician aboard or in which the master failed to follow instructions given by a physician.

In his endeavor to establish a case of negligence for which defendant was liable, plaintiff contends that the fact that Dr. Lewis was away from the ship while it was docked at Honolulu and did not return until about a half hour before sailing time, "until it was *almost* too late for the ship to put plaintiff ashore" (emphasis supplied), is evidence of negligent failure to render medical care. The very language of the contention serves to refute it; for it contains the implicit admission that there was still sufficient time to place plaintiff in a shore hospital had the doctor deemed that action advisable.

"The gravamen of a Jones Act suit is the negligence of the employer of the plaintiff-seaman, and such negligence must be alleged and proved." 4 Benedict on Admiralty § 612, p. 202. That burden plaintiff has failed to sustain.

The conclusion is that there is no evidence whatever from which the jury would have been warranted in finding a verdict for the plaintiff, and the directing of a verdict for the defendant was therefore correct.

Judgment affirmed.

HEALY, Circuit Judge (concurring).

I concur in the affirmance on the ground that the showing of want of due care on the part of the ship's doctor was insufficient to warrant submission of the case to the jury.