71 So.2d 716 (1954)
PRINE
v.
CONTINENTAL SOUTHERN LINES, Inc. et al.
No. 8112.
Court of Appeal of Louisiana.
March 24, 1954.
*717 Jackson, Mayer & Kennedy, Shreveport, Stafford & Pitts, Alexandria, for appellants.
Wellborn Jack and John E. Lawhon, Shreveport, for appellee.
AYRES, Judge.
Plaintiff sustained serious, permanent and painful injuries in an accident at the intersection of Texas and Market Streets in the City of Shreveport by being struck and knocked to the pavement by a passenger bus of the defendant, Continental Southern Lines, Inc., driven and operated at the time and in its service by the defendant, W. E. Wilbanks. Plaintiff itemized his damages for pain and suffering, past and future, shock, permanent injuries, loss of earnings, past and future, and for medical hospital and doctor bills, aggregating $43,579.62, for which he sought recovery from both defendants, in solido.
Texas and Market Streets are both main thoroughfares in downtown Shreveport, and included among the main highways passing through their intersection are U. S. No. 71 and No. 80. Intersecting at right angles, Texas Street runs in a general east and west course, and Market Street in a north and south direction. The former is 75 feet wide and the latter 59 feet wide. Across Texas Street there is a well marked and defined pedestrian lane or crosswalk on both sides, in line with and as a continuation of the outline of the sidewalks paralleling Market Street. A center line is marked in both streets.
The accident occurred about 7:15 P.M. October 23, 1952. The weather was clear, the street dry, and the intersection was well lighted. Traffic was controlled by a redamber-green automatic traffic light signal, which was operating normally. Desiring to cross Texas Street from the northeast intersection to the southeast intersection, plaintiff proceeded on a green signal light, walking in the pedestrian lane. After arriving at a point approximately 10½ feet south of the center of Texas Street a bus, which had also proceeded in a southerly direction on Market Street into the Texas Street intersection, in making a left-hand turn, struck plaintiff with the left front of the bus and knocked him for a distance of approximately 15 feet toward the northeast.
Plaintiff alleged that the accident aforesaid and the injuries sustained by him resulting therefrom were caused solely, only and proximately by the negligence of the driver of the bus, particularly, briefly stated, that the driver was at fault in turning left into the intersection without giving a warning *718 signal; turning the corner to the left so as to endanger a pedestrian; operating the bus at a dangerous and reckless rate of speed; failing to keep a proper lookout, and failing to see plaintiff and/or stop or turn to avoid striking him.
In answer to plaintiff's demands, defendants admitted the ownership and operation of the bus and the occurrence of the accident but denied the acts of negligence charged to the operator of the bus or that such acts constituted the proximate cause of the accident, and alleged that the accident was due to and caused by the negligence of the plaintiff in failing to maintain a proper lookout and to exercise proper care for his own safety or, in the alternative, that plaintiff was guilty of contributory negligence, barring his recovery.
The matter was tried in the district court before a jury, which returned a verdict in favor of the plaintiff and against the defendants for the sum of $18,000. From the judgment of the court, based on that verdict, the defendants have appealed to this court. Plaintiff has answered the appeal, praying that the judgment be increased to the amount sued for or for so much thereof as the court may be of the opinion should be allowed.
There does not appear to be any real controversy as to the facts nad circumstances surrounding the occurrence of this accident. The bus involved was a large passenger bus 35 feet long, 8 feet wide, weighing 18,000 pounds. At 7:10 P.M., on the date of the accident, the bus left the station at the intersection of Edwards and Fannin Streets, proceeded to Market Street, and then to the intersection of that street with Texas Street. The evidence, in our opinion, does not clearly establish whether the bus, in arriving at the intersection, stopped or merely slowed down. That is immaterial. The bus, however, proceeded on the green light out into Texas Street to the approximate center thereof, preparatory to making a turn to its left and for the purpose of continuing eastward on U. S. Highway 80. It is also not clearly established whether the driver on reaching the center of Texas Street stopped or merely slowed down, in order to await the passage of one or two northbound vehicles traveling on Market Street, before completing the turn. Nevertheless, after the passage of said vehicle or vehicles, the bus continued forward for the completion of the turn, and when the front of the bus reached a point near the west side of the crosswalk, the driver for the first time saw the plaintiff, some three feet distant, too late to take any precautions to avoid or prevent a collision with him.
Plaintiff began walking across said intersection on the same green light on which the bus proceeded. He was in the pedestrian lane, by himself, and walking at a usual and normal gait. In making this crossing plaintiff was confronted with traffic on Texas Street on his left going west, which could make a right turn into Market Street, and he had also to observe and be on guard for traffic coming north on Market Street that might turn east into Texas Street. The bus, of course, was approaching from his right rear, the intention of the driver being to make a 90° change of course, from south to east and then to proceed east on Texas Street. The stop, or red, light was against the movement of all east and westbound traffic at the moment. On reaching a point approximately midway of Texas Street, plaintiff's attention was attracted by the approach of a vehicle to the east on Texas Street, the tires making the usual noise heard when brakes are applied to a fast-moving vehicle. On hearing this noise, plaintiff looked to his left. It was while his attention was thus called, or momentarily thereafter, that he was struck by the bus. Because of his thus looking to the left, the defendants contend that plaintiff was not keeping a proper lookout. However, plaintiff's reaction to the fastapproaching vehicle was that of any normal person having in mind, and desiring to act with due regard for, his own safety.
There is some dispute as to whether plaintiff preceded the bus or the bus preceded the plaintiff in entering the intersection. From a consideration of all the evidence, it is reasonable to conclude that *719 plaintiff first entered the intersection. Had both been awaiting a green light and proceeded at the same instant, the bus being beyond the center of Market Street with the driver intending eventually to make a lefthand turn, the plaintiff would have been placed in front of, even though to the left, of the bus and, therefore, in view of the driver. According to the defendant driver's testimony, there was no obstruction that would have prevented his seeing plaintiff or the other pedestrian traffic in the cross-walk. Red lights were against the movement of all east and westbound traffic on Texas Street; there was no traffic crossing his intended lane other than the one or two vehicles, as he testified, that were approaching from the south on Market Street, and thereafter, so far as he was concerned, he was not obstructed by any other traffic whatsoever. He was, therefore, in position to keep a proper lookout for pedestrian traffic in the pedestrian lane or cross-walk, which he was about to cross, and with which traffic he was very familiar. He admitted that he did not see plaintiff until he was right on him and, therefore, no other conclusion could be reached except that he was not giving proper attention, observing or keeping a proper lookout as required by the traffic ordinances of the City of Shreveport, offered in evidence, or by the statutes of the State. His own admission makes this conclusion inevitable and inescapable.
The ordinances referred to provide that vehicular traffic at intersections shall make turns at a speed not exceeding five miles per hour so as to permit the vehicle to be under the complete control of the driver, and provide that such turning shall not be made in a manner that endangers pedestrians or property, or without giving proper and sufficient warning, and that pedestrians shall cross the streets at crosswalks. It is contemplated by the ordinance, and so stated therein, that, while the streets are primarily intended for the use of vehicular traffic, nothing therein would be construed to permit the driver of any motor vehicle to drive in any such manner as would endanger the lives of pedestrians using the streets.
Also defining the duties of drivers of vehicular traffic, LSA-R.S. 32:237 subd. C, states the rule applicable to the situation here in this language:
"The driver of any vehicle upon a highway within a business or residence district shall yield the right of way to a pedestrian crossing such highway within any clearly marked cross-walk or any regular pedestrian crossing included in the prolongation of the lateral boundary lines of the adjacent sidewalk at the end of a block, except at intersections where the movement of traffic is being regulated by traffic officers or traffic direction devices, in which event such traffic authority or device shall control. Every pedestrian crossing a highway within a business or residence district at any point other than a regular pedestrian crossing, cross-walk or intersection, shall yield the right of way to vehicles upon the highway."
Blashfield's "Cyclopedia of Automobile Law and Practice", Volume 2A, Pages 167-173, title "Pedestrians", Section 1272, after stating the general rule relative to rights of way, in the absence of statutes or ordinances, that pedestrians have no superior right of passage over vehicles or automobiles approaching crossings irrespective of the priority of approach, but that each has an equality of right in the use of the crossing, which right must be exercised with due and reasonable regard to the safety and convenience of the other, states:
"* * * To insure such safety as between a pedestrian and a motor vehicle arriving at the intersection at the same time, statutes or ordinances expressly give the right of way to pedestrians, under certain conditions. The usual legislation provides in substance that the operator of a vehicle shall yield the right of way to a pedestrian crossing the highway within any marked or unmarked crosswalk at an intersection, except at those intersections where the movement of traffic is regulated by traffic control signals or traffic officers. * * *
*720 "* * * The motorist, therefore, on approaching an intersection, must have his car under such control as to give way to a pedestrian who is crossing the intersection and who is in the line of travel the motorist intends to take, or in such proximity thereto that, if he continues, he will reach the same in advance of the motorist; and, if the pedestrian is upon a crosswalk at a street intersection, using it in an orderly and reasonable manner, the driver of an approaching vehicle must avoid coming within striking distance; he must slow down, change his course or come to a complete stop if necessary."
See also 60 C.J.S., Motor Vehicles, § 389 b, pp. 951-953, wherein it is stated:
"The driver of a motor vehicle must anticipate the presence of pedestrians at crossings or intersections, keep a lookout for them, give reasonable and timely warning of his approach, comply with traffic regulations, and exercise due care to avoid injuring them, that is, such care as a reasonably prudent person would use under similar circumstances, or care commensurate with the existing danger of collision and injury. According to a number of decisions, he is required to exercise more vigilance and care with respect to pedestrians when he is approaching or passing over a crossing than when he is traveling between crossings, and it has been held or stated that at regular crossings or intersections motorists must exercise the highest degree of care to avoid injuring pedestrians, and to this end must be especially vigilant and have his vehicle under such control that it can readily be stopped or diverted."
A statement of our Supreme Court in the case of Mequet v. Algiers Mfg. Co., Ltd., 147 La. 364, 367-368, 84 So. 904, 905, made early in the history of automotive traffic, retains much of its force and applies equally as well today. In the course of its opinion, the court said:
"Automotive vehicles have become a very important and necessary part of the business and social life of the people, and, in view of their advantages and benefits, are permitted to operate upon the public streets and highways, though carrying with them great potential possibilities of danger and destruction. Society, therefore, in conceding them the right to operate, exacts of those taking their advantages a high degree of care in avoiding the known evil results which follow a different course. On those portions of the highways, known to be used by such vehicles, between the points provided for the passage of pedestrians, the latter, in attempting to cross, do so in large measure at their peril, subject to the requirement that the drivers of such vehicles shall not knowingly or wantonly strike and injure them. But at the points provided for the passage of pedestrians they have the right to assume that the operators of such machines will observe that high degree of care imposed by the circumstances. No other condition is consistent with the common and necessary right to use such avenues of intercourse. The frequent occurrence of collisions and accidents argue most forcefully for a rigid enforcement of all traffic regulations intended to prevent such occurrences. Otherwise, the individual who, through choice or necessity, adopts the original mode of locomotion provided by nature, must `take his life and limb in his own hands.' We do not mean by this that he is to be excused for failing to use his own senses to avoid being injured; but the greater duty and care rests upon those who use these dangerous agencies carrying such great possibilities of harm."
See also Duffy v. Hickey, 151 La. 274, 91 So. 733; Norwood v. Bahm, 14 La.App. 261, 129 So. 183, wherein it was held that it was an automobile driver's duty, in approaching street crossings where people were constantly crossing, to have the automobile under full control so that it could *721 be stopped immediately in the event of an emergency.
The plaintiff was not accorded by the bus driver the right of way conferred upon him by both ordinance and statutes. The driver should have allowed plaintiff an opportunity to clear the crosswalk in his lane of travel before crossing or attempting to cross the pedestrian lane. That he did not do, and that, together with the fact that he was not keeping a proper lookout for traffic in his lane of travel and in the pedestrian lane, where he knew, or at least should have known, there was usually considerable pedestrian traffic, constituted the grossest kind of negligence. His failure in these respects and in failing to sound a warning signal of his approach and to make any effort whatever to avoid the accident until it was impossible to do anything effective, constituted the proximate cause of the accident and the injuries resulting therefrom.
But granting, for the sake of argument, that plaintiff was negligent in his failure to observe the approach of defendant's bus under the facts and circumstances as established by the evidence in this case, defendant driver had the last clear chance to prevent the accident and to avoid striking plaintiff.
One of the first duties of those who operate vehicles is to keep a constant lookout ahead to discover the presence of those who might be in danger, and this duty to look ahead and observe never ceases. What a motor operator can see, he must see, and, in legal contemplation, he does see; that is, he is charged with seeing what he could and should have seen, and his failure to see what he could have seen by the exercise of due diligence does not absolve him from liability. The rule is that when a driver sees another in peril, of which the other is not aware, and here it is not even contended that plaintiff was aware of the approaching bus, then a second or subsequent duty arises and devolves upon the driver to use every possible available means to prevent the accident and avert the injury. Therefore, since the defendant driver was not keeping a proper lookout and was not observing the pedestrian traffic in the crosswalk into which he was turning and attempting to cross, there being no obstruction to his view, then, from a legal standpoint, he is charged with seeing and observing what was there for him to see and what he could have seen by the exercise of due diligence. Although plaintiff's presence in the crosswalk was not observed by the driver, it was his duty to so observe him, and his failure does not absolve him of liability. The acts of the driver in this instance are, therefore, the proximate and immediate cause of the accident, and the negligence of the plaintiff in not properly observing the approach of the bus under the facts and circumstances of this case is only a remote cause. The last clear chance doctrine applies even though plaintiff's negligence continued to the very occurrence of the accident.
The doctrine of last clear chance, broadly stated, is that negligence of a plaintiff does not preclude recovery where it appears that the defendant, by exercising reasonable care and prudence, might have avoided injury to the plaintiff, notwithstanding plaintiff's negligence. The practical import of this principle is that a negligent defendant is held liable to a negligent plaintiff, if the defendant, aware of the plaintiff's peril, or although unaware thereof, reasonably, in the exercise of due care, should have been aware of it. This particularly applies where there was a duty on the part of the defendant to have discovered the danger in time to have averted the accident. See 38 Am.Jur., 900, "Negligence", Section 215.
These principles have been thoroughly discussed in the cases of Rottman v. Beverly, 183 La. 947, 165 So. 153, and Jackson v. Cook, 189 La. 860, 181 So. 195. It was held in the latter case that, notwithstanding plaintiff's negligence continued to the very moment of the accident and that the driver of the car did not actually see but could have seen plaintiff in his peril if he had been keeping a proper lookout, the mere fact *722 that the driver did not see plaintiff did not absolve defendant from liability, because, as stated, his duty of looking ahead and observing never ceases, and his failure to see what he should have and could have seen did not relieve him of liability.
That was the holding by this court in the case of Parker v. Home Indemnity Co. of New York, La.App., 41 So.2d 783, and the principle was also recognized in the case of Lawrence v. Sansone, La.App., 48 So.2d 281.
We, therefore, conclude that the defendants are liable in damages for the injuries sustained by plaintiff.
Plaintiff contends that the award by the jury and in the judgment appealed from is inadequate and, in answer to the appeal, prayed that the award be increased. Defendants are of the opinion that the award is excessive and should be reduced.
Plaintiff at the time of the accident was twenty-two years of age, with a life expectancy exceeding forty years. His previous state of health was good. He entered the Naval Air Corps in 1948, after a thorough physical examination, and served for more than three years, and, after undergoing another examination, was given an honorable discharge. Subsequently, he made application for enlistment in the Coast Guard Academy and succeeded again in passing a rigid physical examination.
Prior to entering service, plaintiff graduated from high school, and during his period of service continued to pursue his education by attending service schools. In those schools he particularly studied and became proficient in mathematics.
After terminating this service, he obtained a position with a truck and trailer works as parts manager at a salary of $225 per month. In pursuing this occupation, he no doubt made great use of the training, education and experience that he obtained in service and in the service schools. The discharge of his duties required that he have excellent vision. After the accident, he was no longer able to pursue his usual work but obtained a position at a slightly less salary as radio operator for a municipal police headquarters, where detailed and constant reading and eye strain were not required. At odd times, to supplement his income, he delivered blueprints and photostats for another concern over town.
After the accident, plaintiff was carried to a local hospital where he was in a state of mild shock and suffered severe pain in the left side of his face and jaw and his left shoulder and right knee. He sustained bruises and lacerations over his face and other parts of the body, and particularly a laceration two and half to three inches long on the left mandible, and one about an inch and half in length over the left eyebrow. His left eye was bloodshot and greatly swollen. X-ray examinations revealed a fracture or fractures of the infra-orbital ridge, which extended into the maxillary sinus. Both upper and lower jaws were broken, and, in the setting of these fractures, the jaws were made firm, fast and immovable, and wired together. In this condition plaintiff remained for some forty days. While there was some conflict in the testimony as to the necessity for foregoing the use of narcotics to relieve and alleviate pain on account of the tendency of such drugs to produce a nauseated condition, nevertheless, plaintiff was not given such of those drugs as are usually administered. As late as November 9, 1953, plaintiff had a numbness and a burning sensation in the left cheek, and his shoulder at that time suffered pain, and the muscles and ligaments thereof were swollen and inflamed.
The evidence reveals, too, that plaintiff had a serious and permanent injury to his left eye and that, for all practical purposes, he has sustained the destruction or complete loss of the usefulness of that eye. This injury consisted of a tear where the retina had pulled loose from its anterior insertion, which caused an edema or swelling. This distorted the macula, which is the focusing point in the eye for an image to be transmitted to the brain, and without which there could be no vision at all. This disturbance caused plaintiff to see with a *723 double vision out of his left eye, the second image appearing super-imposed over the real image, but extending to the side and above, causing an imperfect, blurred, or as plaintiff expressed it, a "fuzzy" vision. This condition had deteriorated on the date of the trial to such an extent that it could not be corrected or even improved upon by the use of glasses, surgery or otherwise. This condition was also described as an enlarged, depressed area in the center of the macula. The retina is the nerve element of the eye that receives light rays and transfers them into nerve impulses that give the sense of sight. The macula is the center and most sensitive part of the retina and is concerned with the acuity of vision. The difficulty with the eye has caused and now causes and, according to the medical testimony, will continue to cause plaintiff considerable annoyance, such as seeing double with his left eye, and conflicting with the normal vision of the right eye, making it practically impossible for him to carry on work involving more than a minimum of reading. His ability to drive a motor vehicle, especially at night, has been adversely affected, and his viewing motion pictures has been rendered difficult.
As aforesaid, the injuries suffered by plaintiff, such as the broken jaw, both upper and lower bones, the treatment thereof without the usual sedatives, produced excruciating pain and suffering for a considerable length of time. It was testified that from a fractured jaw alone it was not unusual to experience pain for a period of four to five months. There appears some degree of permanency due to the imperfect occlusion of the teeth. The testimony reveals, too, that plaintiff has suffered and continues to suffer severe, painful headaches.
In the condition in which plaintiff has been left by this accident, it would not be unreasonable to conclude that he has suffered and will continue hereafter to suffer serious and permanent disability, and that such disability will, without doubt, retard or prevent his advancement in his work or in any line of endeavor, for that matter, and will likely, in many instances, prevent him from obtaining employment in the future. From his condition, it can be easily concluded, without doubt, that he is now a very poor industrial risk. In his condition, it is problematical whether he will ever be able to pass an industrial physical examination. While his loss in that respect is impossible of exact determination, yet these facts merit consideration in arriving at a proper award for the injuries and damages sustained.
Defendants have cited awards approved in former cases as a possible guide to us in this case. We have carefully reviewed those cases and it is deemed unnecessary to prolong this opinion by pointing out all the various facts and circumstances distinguishing them from the case at bar. It is recognized that each case must of necessity be considered in the light of its individual facts and circumstances in determining the nature and extent of the injuries involved and the damages to be awarded, due regard, however, being given toward some degree of uniformity.
The cases cited involved injuries sustained as long ago as 1935, when economic conditions were different and incomparable to those of the present. The purchasing power of the dollar has since been greatly reduced. This court very correctly and appropriately stated in the case of Scott v. Claiborne Electric Cooperative, Inc., La.App., 13 So.2d 524, 532:
"It is now well recognized that the decreased purchasing power of the dollar, due to rise in living expenses, is a proper element for consideration in determining the amount of award in a tort action. Courts take judicial notice of that fact. Bell v. First National Life Insurance Co., La.App., 141 So. 484; Stromer v. Dupont, La.App., 150 So. 32; Van Baast v. Thibaut Feed Mills, La.App., 151 So. 226; Rogers v. Hiram J. Allen Lumber Co., Ltd., 129 La. 900, 903, 57 So. 166, 39 L.R.A., N.S., 202; 15 Am. Jurisprudence, 621."
The cases cited can be further distinguished in other particulars, such as in the *724 nature and extent of the injuries sustained, the permanency thereof, and the pain and suffering undergone by the victims.
In the case of McDowell v. National Surety Corporation, La.App., 68 So.2d 189, 191, where the injuries were stated by the court to be "* * * the petitioner was knocked unconscious. He sustained a brain concussion, a serious injury to one of his eyes, necessitating its removal, a torn cartilage and several other bodily injuries leaving scars on his chin and eyelid. The lost eye has been replaced by a glass eye", and where "the injuries required petitioner to spend seven or eight days in hospitals and he was incapacitated from any kind of work for four or five months. According to his own testimony and that of the doctors who testified in the case, the petitioner suffered great pain and now, long after the accident, he claims to have severe headaches which, one of the doctors stated, could easily be attributed to the injury", the Court of Appeal for the First Circuit affirmed an award of $15,000 allowed for permanent disability sustained by petitioner, including the loss of his eye.
The First Circuit also in the case of Johnson v. Louisiana Coca-Cola Bottling Co., Limited, La.App., 63 So.2d 459, reduced an award of $15,000 to $12,500 to a twenty-seven year old plaintiff who had previously enjoyed physical good health and who was injured by the explosion of a soft drink bottle, striking him in the left eye and necessitating its removal by surgery, and which injuries caused plaintiff pain and sufferring and produced a watery condition in his right eye on many occasions.
Neither the verdict of the jury nor the judgment of the court itemized the award. However, the evidence establishes that plaintiff sustained a loss of $506 in wages and $672.62 incurred for medical services and hospitalization. These fixed damages no doubt were included in the award. Careful and studious consideration of the award in this case has brought us to the conclusion that the verdict of the jury, as approved by the trial judge in his judgment, is neither inadequate nor excessive.
For the reasons herein assigned, the judgment appealed from is affirmed, at the cost of the appellants.