Mrs. Nita Bergeron DEITZ, Individually and as Natural Tutrix of her minor children, Bruce Clinton Deitz, Jr. and Hilda Cecelia Deitz, Appellants,

v.

The GREYHOUND CORPORATION, Appellee.

No. 15909.

United States Court of Appeals Fifth Circuit.

June 5, 1956.

Rehearing Denied July 3, 1956.

328

B. B. Taylor, Jr., Charles W. Phillips, Baton Rouge, La., for appellants.

G. T. Owen, Jr., Baton Rouge, La., Borron, Owen, Borron & Delahaye, Baton Rouge, La., of counsel, for appellee.

Before HUTCHESON, Chief Judge, and CAMERON and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

After the second of two mistrials from an inability of each of the juries to arrive at a verdict, the District Court granted the Bus Company's motion *j.n. o.v.*, Fed.Rules Civ.Proc., 50(b), 28 U.S. C.A., and thus denied the claim for the death of Deitz, Sr., occasioned when his Buick sedan, coming across the heavily traveled east-west arterial Highway U. S. 90 from an adjacent filling station, was hit broadside by a westbound Bus as it sought to avert collision. The Judge, without opinion but by brief minute entry, assuming, at least *arguendo*, negligence on the part of the Bus, held that the decedent was guilty of contributory negligence as a matter of law which, under Louisiana law, defeats recovery altogether. Complaining of this action,

the Dietzs insist that at worst this was a jury issue and that the Court also erred in refusing to give requested charges submitting the doctrine of Last Clear Chance.

■ While it is not for us, in assaying the underlying question of the correctness of granting the motion *j.n.o.v.* to pass upon the credibility of witnesses or weigh evidence permitting conflicting or variable inferences, Gunning v. Cooley, 281 U.S. 90, 50 S.Ct. 231, 74 L.Ed. 720; DeZon v. American President Lines, Ltd., 9 Cir., 129 F.2d 404; Boston & Maine R. R. v. Cabana, 1 Cir., 148 F.2d 150, certiorari denied 325 U.S. 873, 65 S.Ct. 1414, 89 L.Ed. 1991; Roth v. Swanson, 8 Cir., 145 F.2d 262, 265; Moore's Federal Practice, 2d Edition, Vol. 5 at 2314–2315, the very fine bead which the plaintiff must draw to succeed on the evidence of this record is brought into sharp focus by a consideration of the evidence brought forward by the Bus Company, plus those inferences arising from other evidence claimed by it to be conclusively favorable. This is especially so since Deitz, Sr., the driver and sole occupant of the Buick Sedan, was killed almost instantly.

The accident occurred where U.S. 90 runs in an east-west direction through a small group of buildings scattered along the highway a few miles west of Boutte. The highway is a black-topped, concrete slab 24 feet wide and with no painted center stripe. All of the buildings are well back from the highway itself, and the view of the highway to the east of Third Street is unobstructed for at least a mile. The collision took place about opposite Griffin's filling station garage.

In the general area of the collision, there was, on the north side of the highway the Roundhouse Cafe and Griffin's Filling Station Garage. Griffin's Filling Station fronted on the highway. An island of three gasoline pumps was situated 52 feet back from the north edge of the paved slab and about 30 feet to the east of the boundary of a small, shelled

road called Third Street making a T intersection with U.S. 90 and 83 feet west of the entrance to the Roundhouse Cafe. The area between the slab and these buildings was shelled with no perceptible shoulder to the highway or line dividing Griffin's "apron" from the adjacent Third Street. The impact occurred about in front of Griffin's place. When the vehicles came to a stop, the Buick, lying substantially north-south, angled slightly eastward, was completely off the slab and on the shoulder on the south side of the highway at a point about 16 feet west of an imaginary extension of the west side of the little, shelled Third Street. The Buick, with its left middle deeply smashed in, was wrapped around the left-center-front end of the Bus. The Bus, also completely off the highway, angled slightly southwest with its right rear dual wheels a foot or so off the slab.

Just before the collision, which took place about 4:30 p.m., Deitz had had some light food (but no alcoholic drinks) in the Roundhouse Cafe. Apparently he got into his Buick and, intending to return to his motel located, it was later learned, a few miles to the east, he proceeded in a westerly direction on the shell apron in front of Griffin's gasoline pumps. Sticking 6 to 10 feet out from the pumps was an air signal hose which rang a bell as the Buick passed over it. Griffin, nearby and occupied in doing some painting, momentarily looked up, saw the Buick passing in front of the pumps and headed diagonally to the south and west. The Buick was then 12 to 15 feet from the black top highway and in the general area where the shell apron and Third Street ran together. As the Buick reached this spot, Griffin resumed mixing paint and shortly (he did not fix the time) he, "heard the air brakes and then bang. Almost that fast. From the time I heard the air brakes I heard the crash." As Griffin judged it, the speed of the Buick was not over 12 to 14 mph. From this the jury could have concluded that Deitz drove from the Cafe approximately 130 feet to the west

with his car angling toward the south-southwest as he came close to the black top slab.[1]

This was the case as the plaintiffs made it. As made, there was no evidence that Deitz stopped his car, had looked, or had taken any steps to ascertain whether it was safe to enter, let alone, cross the arterial highway. Nor was there anything except the accident and pictures of the wreckage from which to draw any inferences as to the speed or the actions of the Bus either before or as the situation was developing.

In the final analysis, the plaintiffs undertake to make their case out of the testimony of the Bus driver, relying in large part upon inconsistencies and contradictions that appear as he related it from time to time—not as merely showing lack of credibility, but as indicating affirmatively an explanation for the accident which would cast, not exonerate, the Bus Company.

■ On the trial the story [2] was essentially that, seeing the Buick suddenly come out into the highway when the Bus was 125 feet away and proceeding about 45 to 50 mph, the Bus driver reacted promptly to the danger, blew his air horn, put on the air brakes, and pulled toward the left, but before he could stop, the Bus, when a few feet to the left of the center of the highway, hit the Buick broadside pushing it 40 to 50 feet, in effect, over to the final place of rest on the south shoulder. This was different in at least one respect from his written statement [3] given to the Highway Police in which he asserted that the blow-

1. Considering the location of signal hose (6 to 10 feet long), the width of the Buick (about 7 feet), the car must have been within at least 40 feet of the slab as it headed west. With but 30 feet, approximately, from the pumps to the place where the shell apron and Third Street came together, the left swing, with the Buick headed almost south-southwest, had to be relatively sharp.

2. Bergeron, the driver, testified: "Leaving Boutte I was traveling on my proper side of the highway * * * I was traveling on my right side of the highway and nearing Matis' Restaurant [Roundhouse Cafe] * * * I noticed this black car—Buick car * * *. I didn't know it at the time. It was a black automobile parked or moving slowing along the highway and just that quick, about a distance of a hundred, a hundred and twenty-five feet it darted right out into the path of the Bus. In the meantime, I blew my horn trying to warn him to stop; put my brakes on and I cut to the left but the driver of the automobile made no attempt—just continued right in the path of the Bus and in front of my Bus about three feet—approximately three feet was over the imaginary centerline in the middle of the road and I came in contact with the car broadside * * * the front of the Bus caught the car directly in the center of the car and from there I dragged him across the left side of the road on into the shoulder * * * *."

He also stated: "* * * the automo-

bile was facing the highway and he may have been on a small angle in an eastward angle. In other words, just a small angle and just about the distance of a hundred, a hundred and twenty-five feet; that's when I noticed the car and he came right on out in the highway. In other words, he came—he came right out in the road, the side of the apron of the road there * * *."

"Q. Where did the impact take place with reference to the center of the highway * * *? A. * * * the left portion—front of my Bus was about three feet over the highway and his autobile—when I hit him, his automobile was right in front of my Bus * * * I hit him broadside but the left front of my Bus was just a little bit—about three feet over the imaginary centerline."

3. Offered in evidence by the Bus Company, this statement was taken the evening of the accident in the presence of a Bus Company Claims Attorney:

"* * * when I reached about two miles west of Boutte, I noticed a black car parked on the right shoulder of the road facing the highway. My Bus was about one hundred and twenty-five feet from the car at the time I first noticed him. It appeared that the operator of this car was not going to come on the highway, but for a precautionary measure I blew my airhorn to warn him of my oncoming Bus. Upon nearing the car, the operator cut across the highway in the path of my Bus. I was traveling about fifty miles per hour. I applied

ing of the air horn was a precautionary move prior to the Buick's cutting across into the road. It also corroborated the plaintiff's theory that the vehicles moved 25, not 40 or 50 feet, after the impact. But despite these differences, the fact of the Buick suddenly coming out into and across the highway in the path of a large

Bus operating at high, but legal, speed runs throughout as a common thread, with corroboration by some six passengers [4] having the status of disinterested witnesses whose testimony cannot be disregarded, Chesapeake & Ohio Ry. Co. v. Martin, 283 U.S. 209, 51 S.Ct. 453, 75 L. Ed. 983; Quock Ting v. United States,

my brakes and at the same time cut my Bus to the left side of the road to avoid hitting the car. This car continued in the path of my Bus towards the left side of the road. At this time I noticed the operator of the car, he was looking in the opposite direction, paying no attention to my Bus and made no attempts to avoid the collision. The front of my Bus made contact with the left side of the described car. Both car and Bus came to a stop on the left shoulder of the road, about 25 feet from where we made contact * * *."

4. Mrs. Blanchard, right front seat just opposited driver, saw the accident: "* * * A. The Buick car just pulled out in front of the lane of the Bus. * * * when he [Bus driver] saw the car, he blew his horn and applied his brakes and the car [Buick] didn't change speed or direction. It just continued in front of the Bus and that's when we hit him * * * he [Buick] didn't change directions, he just pulled out in front of * * * [the] Bus. He was in the neutral ground * * *. He was just heading straight out on the highway * * *. Q. When the Bus Driver blew his horn, did the Bus continue in the same direction in which it was going at the time he blew his horn? * * * A. Well, he [Bus driver] applied his brakes at the same time which slowed the speed down. He did turn to the left trying to avoid hitting the car * * *."

Mrs. Theriot, aisle seat on right-hand side third from front, saw the accident: "* * * I saw the car [Buick] when it was coming out * * * from close— right close to a filling station * * * it was coming on the road * * * and it looked as if it were headed toward New Orleans * * * the Bus driver tried to avoid an accident and he went to swing on the other side and that's where he hit him; close on the left-hand side, close to the middle to the black line there. Q. Could you estimate how far the bus was from that car when you first saw it? A. Well, I showed a distance to my husband and somebody else and they said it was about 60 to 75 feet when I saw it * * *. Q. * * *

Was it [Buick] out on the highway at that time? * * * A. It was coming out, yes, sir."

Mrs. Pertuit, in aisle seat third or fourth from the front right side, saw the accident: "A. Well, just as we were going—this car left the lane from the right hand side of the highway and into the highway in front of the Bus as we were going along and the driver blew his horn, applied his brakes and it appeared to me the man had stopped as he had entered the highway and then kept going and that's where we struck the man about the middle of the highway * * *."

Mr. Champagne, in aisle seat fourth from front on driver's side, saw the accident: "* * * Well, it just happened at the time that I was just happened to look up to look at the front of the road and then I saw this Buick on the side of the road like he was going to take the road. He was coming very slowly and just about the same time every thing happened together, the driver blew the horn, he started putting on his brakes and he pulled slightly to the left so that if the car would have stopped when he blew his horn, he could have passed him without hurting anybody * . * * The car [Buick] didn't stop so just about when he got to the center of the road that's when the Greyhound Bus hit him * * *."

Seated directly behind the driver, riding as a passenger on a pass, was Bernard, a bus driver in the defendant's employ and presumably classed as an interested witness. He saw the accident. "A. * * * Well, I was seated on the Bus * * * I was leaning. I had my head back, had my eyes closed but I wasn't sleeping and when we reached that point, I felt the brakes of the Bus being applied and I looked up and right in front of the Bus there was a car crossways the road and the Bus had been pulled over a little to the left and the car continued on over and so did the Bus and there was a collision * * *. Q. * * * Could you estimate how far the Bus was from this automobile [Buick] when you looked up? A. I estimate from 15 or 20 feet."

140 U.S. 417, 11 S.Ct. 733, 35 L.Ed. 501; Pennsylvania R. Co. v. Chamberlain, 288 U.S. 333, 53 S.Ct. 391, 77 L.Ed. 819; Foran v. Commissioner, 5 Cir., 165 F.2d 705; Reed v. Murphy, 5 Cir., 232 F.2d 668; Ross v. Commissioner, 5 Cir., 227 F.2d 265; Goldberg v. Commissioner, 5 Cir., 223 F.2d 709, unless it has to give way in the face of overpowering physical facts, or other evidence which simply makes it incredible or inherently improbable, cf. Geigy Chemical Corporation v. Allen, 5 Cir., 224 F.2d 110, quoting from, in footnote 5 at page 114; Teche Lines v. Bounds, 182 Miss. 638, 179 So. 747, 749; Boyett v. Commissioner, 5 Cir., 204 F.2d 205; Griffin v. Kelley, 5 Cir., 227 F.2d 258; Archer v. Commissioner, 5 Cir., 227 F.2d 270; Carmack v. Commissioner, 5 Cir., 183 F.2d 1, certiorari denied, 340 U.S. 875, 71 S.Ct. 121, 95 L. Ed. 636.

██ On this version, reasonable minds could only conclude that Deitz disregarded altogether the Louisiana statutory and judicial rules requiring that a driver entering a heavily traveled, main, "preferential" or "favored" highway ascertain, by stopping, looking and all other suitable means, that the entrance, in the light of existing and visible traffic conditions, may be made in reasonable safety.[5] He is charged with having seen what was so plainly open to him on this long, unobstructed stretch of roadway,[6] and the Bus driver, legally operating the Bus on the highway, was entitled to assume that the Buick would comply with this vital rule of care.[7]

██ This brings us then to the crux of the case: does an asserted prior inconsistent statement of the Bus driver, or certain physical facts demonstrated by photographs, either alone or together, present contrary "facts" which the jury could credit, and, on the basis of the "old" or "new" facts permit inferences that the Bus violated some duty which, rather than Deitz's negligence, caused his death?

The plaintiffs insist that the Bus driver's remarks[8] made in the course of a

---

5. Myers v. Maricelli, La.App., 50 So.2d 312; Goff v. Sinclair Refining Co., La. App., 162 So. 452; Myers v. Landry, La.App., 50 So.2d 318; Maloz v. New Orleans Public Service, Inc., La.App., 65 So.2d 339; Harrell v. Goodwin, La. App., 32 So.2d 758; Porter, for and on Behalf of Porter v. de Boisblanc, La. App., 64 So.2d 864; Par. E, LSA–R.S. 32:237.

6. Bergeron v. Roberson, La.App., 63 So. 2d 20; Shipp v. Ferguson, La.App., 61 So.2d 531; Hanks v. Arkansas & Louisiana Missouri Ry. Co., La.App., 62 So. 2d 139; Dupre v. Union Producing Co., La.App., 49 So.2d 655; Myers v. Maricelli, supra; Myers v. Landry, supra; McMorris v. Webb, La.App., 67 So.2d 146; Robbins v. Mydland, La.App., 81 So.2d 561.

7. Silvera v. Gallardo, La.App., 63 So.2d 15; Trahan v. Lantier, La.App., 33 So.2d 136; cf. Jenkins v. Firemen's Insurance Company of Newark, La.App., 83 So.2d 494.

8. State Trooper Laque, off duty, arrived at the scene of the accident almost immediately from his nearby home: "A. * * * Well, the first thing I asked Bergeron [Bus driver], I said, 'Well, what happened? How did you get your Bus way over here?' * * * I asked him, 'How did you get way over here on the wrong side of the road?', or something to that effect and he told me as he saw the—he said, 'I was going toward Thibodeaux and as I saw this car enter the highway,' he said, 'I, naturally, assumed that the car was going to head West and when he did, I pulled over to the left lane to go around him, but instead the car turned left to go toward New Orleans and naturally I ran into it * * *.' " Disavowing any effort to repeat the exact words used by the Bus driver two years before, he repeated on cross examination: "A.—Well, now I asked him—this is the substance of what I asked him. I said, 'Bergeron, what are you doing over here on the wrong side of the road? How did you get there?' He said, 'When I saw this car entering the highway I naturally assumed that the car was going to head west, so therefore I cut my Bus into the left and drove to drive around him, but instead, the car made a left turn to go the other way and I ran into him.' That's the substance of our conversation. I don't remember it word for word."

The Bus driver neither admitted nor denied making this statement and the most

conversation with the Louisiana Highway Patrolman immediately after the accident were *res gestae* and showed, or permitted the jury to conclude, that the But got far over into its left lane, not out of an emergency reaction to the Buick suddenly coming out into the highway (as claimed in trial testimony), but rather as a more or less normal maneuver to pass or overtake it under the mistaken assumption that the Buick was entering the highway with the purpose of turning to its right to proceed west.

With great ingenuity this is then woven into the fabric of a brilliant argument based on claimed physical facts,[9] the essence of which is that the accident occurred, not as the Bus driver contends to the left of center of the highway some 40 or 50 feet from the point of final resting, but clear over on the left shoulder and at a point exactly 24 feet from the place of rest. Since the Bus driver admits, and the facts compel it anyway, that the Bus could not have gotten where it finally ended if the Bus, while 3 feet left of center, hit the Buick 40 to 50 feet off, the plaintiffs urge that with the impact in fact occurring on the shoulder, it establishes at least two things: first, that the Bus, whose front wheels were in virtually a straight ahead position, had to have been considerably beyond 125 feet from the point of impact when, first sighting the Buick, the Bus swung to the left; and, second, since the Buick had gotten clear over to the south shoulder, it

proved that there was ample time and distance for the Buick to have entered the highway. These, the plaintiffs then argue, add up to permit a jury to determine whether Deitz was contributorily negligent and whether the Bus was guilty of some negligence in pulling left into the Buick's lane.

Indulging, as we must, every favorable, helpful inference which fair-minded men could reasonably draw, we conclude that on none of these hypotheses was there a case for the jury.

Assuming that the position of the Bus permits an inference that the swing to the left commenced beyond the 125-foot distance fixed by the driver, there is nothing in these physical facts or other testimony to allow that inference to be applied to a point beyond an extension of the Bus's apparent course. Applied most favorably, and reconstructing the scene as the plaintiffs would have us do, this puts the Bus in its own right-hand lane within 230 feet of the point of impact. What then are the consequences? Can we say that reasonable minds could agree that a 17-foot sedan can come into and across a main thoroughfare right in the path of an oncoming 13-ton bus, then scarcely two-thirds of a city block away, rapidly approaching at a lawful speed of nearly 73 feet per second? The vehicles are but three seconds apart in point of time, and the distance[10] required to stop is even greater. The fact that Deitz nearly "made" it, or might have had not

he did was to say that he did not remember telling Lt. Laque that.

9. The Bus, when stopped angling slightly to the southwest, was completely off the highway, its front wheels apparently straight. There were no skid marks of any kind on the black topped highway surface either from the bus's tires in braking or, more important, from the effect of dragging or pushing the Buick broadside. All glass, debris, etc., was on the shoulder and a deep trough in the shell shoulder made presumably by the Buick's smashed right rear wheel lead 24 feet from an "explosive" gouge on the shoulder direct to the Buick's left rear wheel. The left front-center of the Bus hit the middle left side of the Buick with no apparent serious damage to the left front or rear fender indicating a southeast angular heading by the Buick at the moment of impact.

10. The Greyhound Lines' Safety Chart based on tests conducted on dry, level cement pavement with loaded buses, admitted in evidence without objection and entirely uncontradicted in this record, on a reaction time of ¾ second shows that at 50 mph, the Bus will travel 55 feet before the driver can react; and 176 feet is then needed to stop after braking, or a total of 231 feet; at 45 mph the distance is 49½, 144½ and 194 feet respectively.

the Bus pulled left does not change this for the rule of prudence is not tested by the providential fortune of the careless or foolhardy.

With the oncoming Bus in full view, it was, we consider, contributory negligence as a matter of law for Deitz to put himself in that position. And this counterbalances any negligence which, *arguendo*, we may assume on the part of the Bus in misjudging the intended course of the Buick.

■■ The case then, almost with the rapidity with which death was closing in on Mr. Deitz, suddenly narrows itself into the specific inquiry of what the Bus at that stage could or ought to have done. Certainly, from the evidence offered, there was nothing about the appearance of the Buick as it first came out toward or onto the black top highway to compel the Bus driver to conclude at that instant that the Buick intended to go clear across and swing east in the south lane. At best, the jury could not find that the Bus driver would know this until the front end of the Buick reached near the center of the highway. Considering the Buick's speed (Griffin estimated it at 12 to 14 mph), this would take nearly one second, during which time the Bus would have come nearly 73 feet closer. Assuming that, despite woeful neglect by Deitz, the Bus driver's actions must yet be retrospectively tested [11] as though he had ample time to reflect and act, what could

have been done? At this stage, a 17-foot automobile is blocking two-thirds of the highway not over 150 feet away. In the undisputed reaction time of three-quarters of a second, the Bus would run another 49½ to 55 feet, leaving scarcely 90 to 100 feet between them when the brakes could be applied. There is no showing of any evidence that at its speed, in this situation, the Bus could then have stopped, or, in that fleeting moment, it could or ought to have pulled to the right instead of the left. For it to have been a Last Clear Chance in law, the plaintiff must prove it to have been one in fact [12] with a means actually open to the Bus which, consistent with the equally dominant necessity of safety to its own passengers, prudence required it to take.

■ Indeed, if there were a last clear chance, or chances, it was for Deitz who, upon first entering on the slab, again after traversing part of it, could have seen the Bus charging down on him either in its right lane (as claimed by it) or in the left lane as contended by the plaintiffs. At each stage, with his slow speed, Deitz could have stopped quickly or, with the burst of speed and power the plaintiffs insist the Buick had, he could have swung around to the right by utilizing the broad, flat shoulder area to the west and south of the highway. At that stage responsibility shifted to Deitz for Louisiana holds a person to what he

11. Of course, this is not the Louisiana Law, Finance Security Corp. v. Alford, La.App., 63 So.2d 872, 874: "We believe that Birkmier was faced with an emergency and was called upon to take one of two courses, either to stop, or to pull over to his right shoulder. Had he chosen to stop, the accident might never have happened. However, the law of this state is well settled to the effect that when an automobile driver, who by the negligence of another and not by his own negligence, is suddenly confronted by an emergency and is compelled to act instantly to avoid a collision, he is not guilty of negligence, if he makes such a choice as a person of ordinary prudence, placed in such a position, might make, even though he did not make the wisest choice. Although, in

this particular instance, it might have been wiser to stop immediately, we do not believe that Birkmier can be held negligent because he took the other alternative which, at the time and under the circumstances, might have appeared to him to be the better one. * * *" And see, Shipp v. Ferguson, supra.

12. Prine v. Continental Southern Lines, Inc., La.App., 71 So.2d 716; Heydorn v. New Orleans Public Service, Inc., La. App., 35 So.2d 893; Anderson v. Southern Bell Telephone & Telegraph Co., La. App., 74 So.2d 761; Hebert v. Meibaum, La.App., 19 So.2d 629, affirmed 209 La. 156, 24 So.2d 297; Lapuyade v. Pacific Employers Insurance Company, 5 Cir., 202 F.2d 494.

could have seen and what he could have done had he seen.[13]

The judgment was right and is

Affirmed.

---

13. Bagala v. Kimble, 225 La. 943, 74 So. 2d 172; Bergeron v. Department of Highways, 221 La. 595, 60 So.2d 4; Jackson v. Cook, 189 La. 860, 181 So. 195; Rottman v. Beverly, 183 La. 947, 165 So. 153; and see Brown v. Louisville & Nashville Railroad Co., 5 Cir., 234 F.2d 204.